## STATE ex rel. SHORT, Atty. Gen., v. NORMAN, Judge.

No. 13023—Opinion Filed March 21, 1922.

Rehearing Denied April 18, 1922.

(Syllabus.)

### 1. Banks and Banking—State System—Constitutional Provision.

Section 1, article 14, Williams' Constitution, is the keystone of the body of laws relating to banks and banking subsequently enacted by the Legislature in pursuance of its mandate.

### 2. Same—Legislative Enactments.

This section of the Constitution charges the Legislature with the duty of enacting general laws embodying the two central and closely related ideas made prominent therein, to wit: First, control and regulation of state banks by a banking board under the

control of the Bank Commissioner; and, second, protection of depositors and individual stockholders.

**3. Same.**

The very first session of the Legislature convening after statehood vitalized this provision of the Constitution by enacting chapter 6, Session Laws of 1907-1908, entitled "Banks and Banking."

**4. Same—Banking Department—Depositors' Guaranty Fund.**

This chapter contains an elaborate system of laws relating to banks and banking, which, among other things, provides as directed for the creation of a banking department to be under the control of a Bank Commissioner with sufficient power and authority to regulate and control all state banks, and also provides for the establishment of a depositors' guaranty fund for the protection of depositors and individual stockholders.

**5. Same—Construction of Statutes.**

While this system of laws has been amended from time to time, it has remained substantially the same. Provisions thereof having the most direct bearing on the question involved herein as they now exist may be found in sections 276-298, 299, 300-302-304, Rev. Laws 1910, and certain provisions of the Session Laws of 1913 and 1915. These acts of the Legislature being passed in pursuance of the direct mandate of the Constitution to carry out specific objects, they must be liberally construed to put into effect the constitutional mandate.

**6. Same—Special and General Provisions.**

The system of laws vitalizing the Constitutional mandate being special acts applying only to banks and trust companies, they supersede the general laws relating to winding up the affairs of other corporations.

**7. Same — Insolvent State Banks — Exclusive Jurisdiction of Bank Commissioner.**

This system of laws, and particularly the section thereof specifically referred to in this opinion, confer upon the Bank Commissioner, or some person under his control and direction, the sole and exclusive jurisdiction to take possession of an insolvent bank and proceed to wind up its affairs and enforce the personal liability of the stockholders, officers, and directors.

**8. Same—Operation of Bank Guaranty Law.**

By this system of laws it was the intention of the Legislature that the bank guaranty law shall function in two ways, to wit: First, by immediately paying the depositors of the insolvent bank in full with cash available, or that can be made immediately available from the assets of the bank, together with the money on hand in the guaranty fund, where such fund is sufficient for that purpose; and, second, where such funds are not sufficient for such purpose, by issuing certificates of indebtedness payable from

year to year as money comes into the guaranty fund out of the assessments and emergency assessments levied against solvent banks as provided by law.

**9. Same—Interference by District Court Through Receivers.**

That the law is functioning under the one mode or the other furnishes no warrant whatever to the district court to interfere with the bank commissioner by the appointment of receivers, where he is proceeding as directed by sections 302 and 304, Rev. Laws 1910, to wind up the affairs of a failed bank and to enforce the personal liability of the stockholders, officers, and directors.

**10. Same—"Winding Up Affairs of Failed Banks."**

The term "wind up," when construed in connection with the context of the section in which it is found and in connection with the broad terms of section 304, supra, undoubtedly embraces the entire process of settling the accounts and liquidating the assets of insolvent banks for the purpose of distribution among creditors and dissolving the corporation.

**11. Same — Status of Guaranty Fund and Failed Bank—Distribution of Assets.**

The guaranty fund is created by assessments and replenished by emergency assessments levied against solvent banks, and it becomes a creditor of the insolvent bank whenever it pays the depositors of such bank, and in that event its status is just the same as that of any other creditor, except the state has a first lien upon the assets of the bank to secure the payment to the guaranty fund of such sum or sums as it has actually paid out to the depositors of such bank. If the guaranty fund does not become a creditor of the failed bank; that is, if there is no money paid out of the fund to the depositors of such failed bank, the assets of the bank are distributed among the depositors and other creditors in the process of winding up the affairs of such bank pursuant to the general directions to the Bank Commissioner contained in the general statute hereinbefore referred to.

**12. Same—Constitutionality of Bank Guaranty Law.**

As thus administered, the guaranty feature of the law can never result in the taking of anything of value from the depositors of failed banks, and it is, therefore, impervious to the charge of unconstitutionality made against it.

Miller, Elting, and Kennamer, JJ., dissenting.

Original Proceeding for Writ of Prohibition.

Proceeding by the State, on the relation of George F. Short, Attorney General, against John Norman, Judge of the Twenty-Second Judicial District. Writ granted.

George F. Short, Atty. Gen., Wm. H. Zwick, Asst. Atty. Gen., and M. M. Thomas

(for Banking Department), for plaintiff in error.

Geo. S. Ramsey, Fred M. Carter, and A. L. Beckett, for defendant in error.

KANE, J. This is an original proceeding commenced in this court by the state, on the relation of the Attorney General, against John Norman, judge of the district court of the Twenty-Second judicial district, for the purpose of procuring a writ of prohibition. It appears from the record before us that the Bank of Commerce of Okmulgee, Okla., through its board of directors, voluntarily placed said bank, together with all of its assets, in the hands of the State Bank Commissioner; that subsequently the Bank Commissioner, after an examination into the affairs and condition of said bank, found and so declared it to be insolvent, and proceeded to take possession thereof, together with all its assets, for the purpose of winding up its affairs and to enforce the personal liability of its stockholders, officers, and directors. In pursuance of this purpose, the Bank Commissioner, through the Attorney General, instituted approximately 100 suits against the stockholders and debtors of said bank, for the purpose of reducing their liabilities to cash, and paying the unsecured depositors as provided by law; that in one of these actions, styled The State of Oklahoma ex rel. Attorney General v. W. J. Harmon, the defendant, who was sued as a stockholder to recover the double liability prescribed by statute, filed an application for the appointment of a receiver upon various grounds; that subsequently the plaintiff filed its motion to strike the application for the appointment of a receiver from the files, and also filed a demurrer to the petition for a receiver which motion and demurrer were overruled by the court. That thereupon the district court appointed two receivers for the Bank of Commerce and issued an order requiring the Bank Commissioner forthwith to deliver all of the books, records, moneys, and assets of the failed bank to the receivers thus appointed and restraining the Bank Commissioner from further proceeding in the matter of winding up the affairs of the bank. Thereafter, upon application of the Attorney General setting up these facts in detail, this court issued an alternative writ prohibiting the district court from further proceedings under the petition and application for the appointment of receivers, and ordered that a return and answer to such alternative writ be filed on a day certain.

The cause now comes on for hearing upon the application of the Attorney General to make the alternative writ permanent and the petition filed by the plaintiff and the return thereto filed by the defendant.

In the brief filed by the Attorney General in this particular proceeding two or three preliminary questions of practice and procedure are presented for consideration, which it will not be necessary to notice, for the reason that the power of the district court to appoint a receiver is now directly presented for review by a proper proceeding in error in the case in which the original order was made. This proceeding in error is No. 13038, entitled State of Oklahoma ex rel. Attorney General v. W. J. Harmon, and it is stipulated that this proceeding in error shall be submitted for consideration with this original proceeding.

In these circumstances there is but one question presented for our consideration, which is succinctly stated by the Attorney General in his brief as follows: "Is the jurisdiction of the Bank Commissioner and the Banking Board in the liquidation of an insolvent bank under the Constitution and laws of this state, original, sole, and exclusive, or can their jurisdiction be interfered with and superseded by a court of equity, in the appointment of receivers to liquidate insolvent banks?"

While counsel for the defendant in their application for the appointment of receivers in the district and in their return to the alternative writ in this court charge various state officers, and particularly the Bank Commissioner, with many acts of maladministration in office in the matter of executing the banking laws of the state, and further allege that the Bank Commissioner arbitrarily threatens to misapply the proceeds from the assets of the failed bank coming into his hands, we do not apprehend that they entertain the view, that this would warrant the district court in discharging these constitutional and statutory state officers and replacing them with receivers appointed by the court, if, as the Attorney General contends, the jurisdiction of the Bank Commissioner and the Banking Board over the liquidation of insolvent banks is, by the Constitution and statute laws of the state, made sole and exclusive.

While it is true, as counsel say, that fraud cuts down everything, even judgments of courts, and renders it void, and that the exercise of unauthorized arbitrary power by public officers is pernicious and should be restrained by the courts, yet we are unable to find any authority for holding that the mere maladministration of a public office or the unauthorized exercise of arbitrary

power by a public officer warrants the judicial branch of the government in repealing or rendering inoperative a positive enactment of constitutional or statutory law. Indeed, in justice to counselor, we may say that while their application for a receiver and their return to the alternative writ are replete with various charges of maladministration, dishonesty, and corruption in office, in their brief, which was prepared more soberly after mature reflection, they do not seriously rely on these charges.

So, as we view the case, if we find that the legislative department has granted the exclusive power and authority to the Banking Board and the Bank Commissioner to wind up the affairs of insolvent banks and these laws do not violate any constitutional rights of the banks' creditors, this disposes of all the questions properly involved in the controversy.

The matter of the regulation and control of state banks has been a matter of grave public concern in this jurisdiction ever since the enactment and adoption of the first Constitution, by which it was erected into a sovereign state. Section 1, art. 14, Williams' Constitution, provides:

"General laws shall be enacted by the Legislature providing for the creation of a banking department to be under the control of a Bank Commissioner, who shall be appointed by the Governor for a term of four years, by and with the consent of the Senate, with sufficient power and authority to regulate and control all state banks, loan, trust and guaranty companies, under laws which shall provide for the protection of depositors and individual stockholders."

This constitutional provision is the keystone of the body of laws relating to banks and banking subsequently enacted by the Legislature pursuant to its mandate. This section charges the Legislature with the duty of enacting general laws embodying the two central and closely related ideas made prominent in the section, to wit: First, control and regulation of state banks by a Banking Board under the control of a Bank Commissioner; and, second, protection of depositors and individual stockholders.

The very first session of the Legislature convening after statehood sought to vitalize this provision of the Constitution by enacting chapter 6, Session Laws 1907-1908. This chapter contains an elaborate system of laws relating to banks and banking which, among other things provides, as directed for the creation of a banking department to be under the control of a Bank Commissioner with sufficient power and authority to regulate

and control all state banks, and also provides for the establishment of a depositors' guaranty fund for the protection of depositors and individual stockholders.

While this system of laws has been amended from time to time, it has remained substantially the same; the part thereof having the most direct bearing on the questions we now have under consideration, as they now exist, being found in sections 276, 298, 299, 300, 302 and 304, Rev. Laws 1910, and certain provisions of the Session Laws of 1913 and the Session Laws 1915.

These sections prescribe generally the circumstances in which the Bank Commissioner may take charge of failed banks; for a depositors' guaranty fund and the manner of its operation; for levying assessments and emergency assessments: general directions to the commissioner in winding up the affairs of failed banks, etc. We will not undertake to quote these various sections of the statute in full, except where we find it necessary to the discussion of some phase of the main question now under consideration.

These acts of the Legislature being passed in pursuance of the direct mandate of the Constitution to carry out specific objects, they must be liberally construed to put into effect the constitutional mandate. Section 276, supra, provides in substance: That any state bank may place its affairs and assets under the control of the Bank Commissioner by posting a notice on its front door as follows: "This bank is in the hands of the State Bank Commissioner." The posting of such notice, or the taking possession of said bank by the Bank Commissioner, shall be sufficient to place all of its assets and property of whatever nature in the possession of the Bank Commissioner, and shall operate as a bar to any attachment proceedings.

This is the section under which the bank in this case placed its affairs and assets under the control of the Bank Commissioner, and the authority for so doing seems too clear for any serious controversy to arise over its proper exercise. Section 302, supra, provides in substance: Whenever any bank shall voluntarily place itself in the hands of a Bank Commissioner, or whenever the Bank Commissioner shall become satisfied of the insolvency of any such bank, he may, after due examination of its affairs, take possession of said bank and its assets, and proceed to wind up its affairs and enforce the personal liability of the stockholders, officers, and directors.

All this has been done by the Bank Commissioner as directed. He has made the required examination of the affairs of the bank, found the same to be insolvent, and he was proceeding to wind up its affairs when interfered with by the district court. Section 304, supra, provides:

"The Bank Commissioner shall take possession of the books, records, and assets of every description of such bank, * * * collect debts, dues and claims belonging to it, and upon order of the district court, or judge thereof, may sell or compound all bad or doubtful debts, and on like order may sell all the real or personal property of such bank * * * upon such terms as the court or judge may direct, and may, if necessary, pay the debts of such bank, * * * and enforce the liabilities of the stockholders, officers, and directors: Provided, however, that bad or doubtful debts as used in this section shall not include the liability of stockholders, officers or directors."

The Bank Commissioner was seeking to enforce the liability of a stockholder in the action in which the receiver was appointed. It seems to us that in performing the various acts hereinbefore set out, the Bank Commissioner was but performing his plain, constitutional and statutory duties. The mandate of the Constitution, as we have seen, is that general laws shall be enacted providing for the creation of a banking department to be under the control of a Bank Commissioner with sufficient power and authority to regulate and control all state banks. This mandate, we think, has been thoroughly and completely carried out by the various Legislatures dealing with this subject.

The system of laws vitalizing the constitutional mandate being special acts applying only to banks and trust companies, they supersede the provisions of the general laws relating to the dissolution and winding up of the affairs of other corporations. Authorities supporting this conclusion are numerous. The following are a few of those cited by the Attorney General in his brief: In re Murray Hill Bank (N. Y. App.) 47 N. E. 298; McDavid v. Bank of Bay Minette (Ala.) 69 South. 452; Cartmell et al. v. Commercial Bank & Trust Co. et al. (Ky.) 156 S. W. 1048; State ex rel. Lofthus, State Bank Examiner, et al. v. Langer, Attorney General (N. D.) 177 N. W. 408. It is quite true that none of the acts construed in the foregoing cases contain provisions for the protection of depositors by the creation of a bank guaranty fund, and counsel for defendant seek to make some point on this distinction. They say in substance that our banking system is built around the one central idea of immediately paying the depositors of failed banks in full, and any right which the state may by statute acquire in the assets of a failed bank is acquired by reason of, and in consideration for, such payment. From this, they argue that, inasmuch as it appears that by reason of depletion of the bank guaranty fund it is impossible to immediately pay depositors in full, as contemplated by section 303, supra, the bank guaranty law fails to function, with the result that the Bank Commissioner loses control over the assets of the failed bank. They further say in effect: Indeed, we do not believe that it was ever the intention of the Legislature that the Bank Commissioner should have anything to do with administering the assets of a failed bank further than to reimburse the depositors' guaranty fund where the depositors are or may be paid in full therefrom.

We are unable to agree with this view of the law. In the first place, the banking laws, as hereinbefore pointed out, are built around the two central but closely related ideas contained in section 1, art. 14, Williams' Constitution, to wit: Control and regulation of state banks by state officers; and, second, protection of depositors. But the fundamental weakness of this argument is that it is based upon the unsound premise that the bank guaranty law fails to function whenever the bank guaranty fund becomes depleted to the extent that it is impossible to immediately pay depositors in full. This, we think, is an erroneous view of the law. Clearly, that a contingency might arise where it would be impossible to immediately pay the depositors in full was foreseen by the Legislature and provided against by the enactment of section 300, supra, which provides in part as follows:

"Whenever the depositors' guaranty fund shall become impaired or be reduced below said five per cent. by reason of payments to depositors of banks which have failed, the State Banking Board shall have the power, and it shall be their duty, to levy emergency assessments against the capital stock of each bank * * * doing business in this state sufficient to restore said impairment or reduction below five per cent.; but the aggregate of such emergency assessments shall not in any one calendar year exceed two per cent. of the average daily deposits of all state banks. * * * If the amount realized from such emergency assessments shall be insufficient to pay off the depositors of all banks which have failed, having valid claims against said depositors' guaranty fund, the State Banking Board shall issue and deliver to each depositor having any such unpaid deposit, a certificate of indebtedness for the amount of his unpaid deposit, bearing six per cent. interest. Such certifi-

cates shall be consecutively numbered and shall be payable upon the call of the State Banking Board, in like manner as state warrants are paid by the State Treasurer, in the order of their issue out of the emergency levy thereafter made; and the State Banking Board shall from year to year levy emergency assessments as hereinbefore provided against the capital stock of all banking corporations * * * doing business in this state until all such certificates of indebtedness with the accrued interest thereon shall have been fully paid. As rapidly as the assets of banks which have failed are liquidated and realized upon by the Bank Commissioner, the same shall be applied first after the payment of the expense of liquidation to the repayment to the depositors' guaranty fund of all moneys paid out of said fund to the depositors of such bank, and shall be applied by the State Banking Board towards refunding any emergency assessment levied by reason of the failure of such liquidated bank. * * * "

Now, from a casual consideration of this and the various other sections of the guaranty law referred to, it is reasonably clear that it was the intention of the Legislature that the bank guaranty law shall function in two ways, to wit: First, by immediately paying the depositors of the insolvent bank in full where the cash available or which can be made immediately available from the assets of the bank, together with the money on hand in the guaranty fund, is sufficient for that purpose; and, second, where such funds are not sufficient for that purpose, by issuing certificates of indebtedness payable from year to year as money comes into the guaranty fund from the assessments and emergency assessments against solvent banks as provided for by law. But that the law is functioning under the one mode or the other furnishes no warrant whatever to the district court to interrupt the commissioner by the appointment of receivers, when he is proceeding as directed by sections 302 and 304, supra, to wind up the affairs of a failed bank and enforce the personal liability of the stockholders, officers, and directors. This work must go on, and it is just as necessary for the protection of depositors that it be performed by the Bank Commissioner in cases like this, where the guaranty fund is depleted, as in cases where the depositors have been immediately paid in full. The guaranty law, as we have seen, was created for the protection of depositors and individual stockholders of failed banks in accordance with the direct mandate of the constitutional provisions hereinbefore referred to, and it has protected such depositors to the extent not only of the many million dollars actually paid to them out of the guaranty fund, since its organization immedi-

ately after statehood, but by winding up the affairs of insolvent state banks by expert state officers at a nominal expense to the depositors and other creditors.

Heretofore the commissioner has been able to protect depositors by immediately paying them in full out of the cash and assets of the bank immediately available and money on hand in the guaranty fund. Now, on account, in part at least, of the widespread financial depression, common not only to this state, but to the country at large, and to the world, the guaranty fund has become so depleted that it is necessary to resort to the second means of protection. But this, as we have seen, does not mean that the bank guaranty law has broken down or has failed to function. On the contrary, it means that, owing to the foresight of the Legislature, the financial conditions now prevailing have been apprehended and provided against, and that the bank guaranty law is functioning, not so satisfactorily to depositors as formerly perhaps, but still functioning as it was intended to function under existing conditions. In these circumstances, are we not justified in assuming with confidence that the bank guaranty law in the future as in the past will continue to function, and that the depositors of this failed bank will finally be paid in full with interest out of the assessments and emergency assessments which will continue to come into the guaranty fund from year to year?

There is some apprehension expressed by counsel that where the affairs of an insolvent bank are wound up under the existing circumstances; that is, where the bank guaranty fund is depleted to the extent that it is impossible to immediately pay depositors in full, the proceeds derived from the sale of the assets of insolvent bank must under the law be used to replenish the bank guaranty fund generally, and not for the purpose of paying depositors and other creditors of the particular bank to which the assets belong. To this extent, they say, the guaranty law is unconstitutional and void because in violation of the 14th Amendment to the Constitution of the United States and section 23, art. 2, of Williams' Oklahoma Constitution, both of which provide, in substance, that no private property shall be taken or damaged for private use without compensation.

While a ruling on the question thus raised may not be necessary to the disposition of the case at bar, and we see very little room for any reasonable apprehension on this score; in view of the importance of the ques-

tion under existing circumstances we will briefly notice it. The bank guaranty law, as we have seen, was enacted pursuant to the express mandate of the Constitution primarily for the protection of depositors in failed banks, and it must be liberally construed so as to carry out this purpose. Obviously it was not intended to take from this class of creditors any of the rights to which they were formerly entitled as such depositors, but to add to and increase such rights.

The guaranty fund is not created by using the proceeds derived from the assets of insolvent banks, but by assessments and emergency assessments levied against solvent state banks. That a reasonable taking from solvent banks to protect the depositors of insolvent banks, is within the proper exercise of the police power of the state is no longer an open question in this jurisdiction. · Noble State Bank v. Haskell et al., 22 Okla. 48, 97 Pac. 590, 219 U. S. 104, 55 L. Ed. 112. So we see that whatever taking there is, is always from solvent banks, and that the giving is always to the depositors of insolvent banks. We have heretofore pointed out the two ways in which the bank guaranty law functions. If the law is functioning under the first mode and the depositors are immediately paid in full, then, of course, they have no further interest in the matter, and the affairs of the bank are wound up for the benefit of the bank guaranty fund, out of which the depositors have been paid, and the other creditors; the state, for the benefit of the depositors' guaranty fund, having a first lien upon the assets of the bank. The affairs of insolvent banks have been wound up many times in these circumstances and the process is familiar. In the case at bar, the affairs of the failed bank are being wound up under the second plan, and the question arises: What shall be done with the proceeds derived from the assets of failed banks under these circumstances? The general answer to this question may be found in sections 302 and 304, in substance as follows: The Bank Commissioner shall take possession of the books, records, and assets of such bank, collect debts, dues, and claims belonging to it, and proceed to wind up its affairs and enforce the personal liability of the stockholders, officers, and directors. These are very broad and comprehensive directions, and, unless they are limited by some other provisions of the banking law, they empower the Bank Commissioner to do everything necessary to wind up the affairs of an insolvent bank, including the sale of the assets and the distribution of the proceeds among the

creditors. The term "wind up," when construed in connection with the context of the section in which it is found and in connection with the broad terms of section 304, supra, undoubtedly embraces the entire process of settling the accounts and liquidating the assets of failed banks for the purpose of making distribution and dissolving the corporation. Counsel for defendant claim that language is found in part of section 300, supra, which requires the Bank Commissioner to turn the proceeds from the sale of the assets into the guaranty fund generally instead of paying it to the creditors. The part of section 300 relied upon reads as follows:

"As rapidly as the assets of banks which have failed are liquidated and realized upon by the Bank Commissioner, the same shall be applied first after the payment of the expense of the liquidation to the repayment to the depositors' guaranty fund of all moneys paid out of said fund to the depositors of such bank."

Counsel say: "This is the sole statutory direction to the Bank Commissioner as to his duty with reference to money derived from the liquidation of bank assets, and is wholly incompatible with the idea that he is acting as a receiver." We are unable to agree with this conclusion of counsel. As we view it, this excerpt merely constitutes a limitation upon the broad general power conferred upon the Bank Commissioner by sections 302 and 304, hereinbefore referred to in certain specific particulars and circumstances, that is, it provides for the order in which two of the ordinary items of expense incident to winding up the affairs of an insolvent bank under· our system of laws must be met out of the proceeds of the assets of the bank. that is, first, the expense of liquidation must be paid, and, second, there must be "repayment to the guaranty fund of all moneys paid out· of said fund to the depositors of such bank."

Obviously this part of the section is directed to the Bank Commissioner where there have been moneys paid out of the guaranty fund to the depositors of the particular bank to which the assets belong. and does not apply to a case like this, where no money has been paid out of the fund to such· depositors. If no money has been paid out of the fund to the depositors of such bank, then the assets of ·the failed bank cannot be used to repay the depositors' guaranty fund. for the simple reason that the bank owes it nothing.

The guaranty fund is created by assessments and replenished by emergency assessments levied against solvent banks. and

speaking of it as a legal entity, it becomes a preferred creditor of an insolvent bank by paying the depositors of such bank, and in that event it stands just like any other creditor, except the state has a first lien upon the assets of the bank to insure repayment to the guaranty fund of the sum of money it has paid out to depositors. If the guaranty fund does not become a creditor of the failed bank; that is, if there are no moneys paid out of the said fund to depositors of such failed bank, obivously the proceeds of the assets are distributed among the other creditors in the process of winding up the affairs of such bank pursuant to the general directions to the Bank Commissioner contained in the general statutes hereinbefore referred to. As thus administered it is quite clear that the guaranty feature of the banking law can never result in the taking of anything of value from the depositors or the creditors of a failed bank, and therefore is impervious to the charge of unconstitutionality made against it in the last assignment of error.

For the reason stated, we think the temporary writ of prohibition hereinbefore granted should be made permanent.

HARRISON, C. J., PITCHFORD, V. C. J., and JOHNSON, McNEILL, and NICHOLSON, JJ., concur. MILLER, ELTING, and KENNAMER, JJ., dissent.

MILLER, J. (dissenting). I cannot agree with the conclusions reached in the majority opinion, for it fails to take cognizance of the facts upon which the application for a receiver is based, and thereby fails to reach the merits of the controversy and apply the law applicable to the facts.

This is an original proceeding in this court, asking for a writ of prohibition to issue against the Honorable John Norman, as presiding judge of the district court of Okmulgee county in the Twenty-Second judicial district, to prohibit said district court and the Honorable John Norman, as judge thereof, from proceeding further in case No. 9172, entitled "The State of Oklahoma ex rel. S. P. Freeling, Attorney General, v. W. J. Harmon," which action is now pending in said court.

On the 6th day of February, 1922, an alternative writ of prohibition was issued by this court, made returnable on the 13th day of February, 1922. On that day the Honorable John Norman, as district judge, made his return to said alternative writ of prohibition, which return set forth his answer and defense to the allegations charged in the application for the writ. He attached to and made a part of his answer a complete transcript of all the pleadings filed, actions taken, and orders made in said case No. 9172, pending in the district court of Okmulgee county. In order to correctly determine whether or not the writ of prohibition should issue, it will be necessary to consider the pleadings filed by which the jurisdiction of the district court was invoked.

Said action No. 9172 was commenced by the state of Oklahoma, on relation of S. P. Freeling, Attorney General, against W. J. Harmon. The petition states that on and prior to the 2nd day of November, 1921, the Bank of Commerce was a banking corporation duly organized and doing business under and by virtue of the banking laws of the state of Oklahoma, with an authorized capital stock of $200,000, divided into 2,000 shares of the par value of $100 each, with its principal place of business in the city of Okmulgee, Okmulgee county, Okla. That on the 2nd day of November, 1921, the Bank of Commerce was taken over by the Bank Commissioner of the state of Oklahoma, for the reason that said bank was then and there in an insolvent and failing condition; that the Bank Commissioner took possession of the books, records, and assets of said bank for the purpose of converting its assets into cash and paying the claims of the unsecured depositors in said bank; that the assets of said bank will be insufficient to discharge its obligations to the unsecured depositors; that the Bank Commissioner had made an assessment of 100 per cent. against the stockholders of said insolvent bank. By reason thereof, the state of Oklahoma, by and through its Bank Commissioner and Banking Board, became liable to pay out of the depositors' guaranty fund of Oklahoma, to the unsecured depositors of the bank, the sum of $1,400,000, and that by virtue of the assumption of said indebtedness, and in consideration thereof, and by operation of law, the state of Oklahoma, for the use and benefit of the depositors' guaranty fund, became possessed of a first lien upon the assets of said bank, as well as the liabilities against the stockholders of said bank. That defendant, W. J. Harmon, was the owner of 30 shares of the capital stock of said Bank of Commerce, of the par value of $100 each; and prayed for judgment against the said W. J. Harmon, for the sum of $3,000.

To this petition the defendant, W. J. Harmon, and eight other persons, as interven-

ers,· who alleged they were stockholders of and depositors in said bank, filed a cross-petition in said action asking said district court to appoint a receiver for said insolvent bank. The grounds upon which the defendant, Harmon, and the interveners ask for the appointment of a receiver are set forth in detail in their cross-petition of intervention, which, briefly stated, are as follows:

It sets forth, in detail, the amount of capital stock owned by each of said interveners; that when said bank was closed, November 2, 1921, the unsecured deposits amounted to $1,459,000, and the secured deposits to $547,000; the assets as itemized are approximately $1,460,550. That the State Bank Commissioner, or the State Banking Board of Oklahoma, did not pay to the unsecured depositors any sum whatever from the state guaranty fund at the time said bank was closed, nor at any time since. Not only have they failed to pay the unsecured depositors out of the cash assets of said bank, or the cash assets that can be made immediately available of said bank, and the residue out of the depositors' guaranty fund, but the State Bank Commissioner and the State Banking Board have utterly failed and refused to make any effort to pay the unsecured depositors as provided by section 303, Revised Laws of 1910. That the State Banking Board of Oklahoma is now, and was on November 2, 1921, insolvent, having outstanding certificates of indebtedness known as depositors' guaranty fund warrants of the state of Oklahoma in the sum of $4,000,000, bearing six per cent. interest, and without any available assets ·with which to meet the same. That the State Bank Commissioner and the State Banking Board have filed a vast number of suits in the district court of Okmulgee county in the name of the state of Oklahoma ex rel. S. P. Freeling. Attorney General. against divers persons against whom the Bank of Commerce held notes on November 2, 1921, for the purpose of collecting the amount due on said notes. and in most all of said cases the petitions are signed by Huddleston & Hockensmith, a firm of lawyers in the city of Okmulgee. In most of said suits attorneys' fees are sought to be recovered for the attorneys for plaintiff, notwithstanding the law of Oklahoma provides for an Assistant Attorney General of the state to have charge of all such litigation as attorney for the state. That in January, 1921, and for months prior thereto, there was a banking institution in the city of Okmulgee known as the Guaranty State Bank, which bank was insolvent on January 3, 1921, and for several months prior thereto, which insolvency was known to the State Bank Commissioner as far back as September 27, 1920, but that he permitted said Guaranty State Bank to continue in business, receiving deposits and making loans while insolvent, and in violation of law. That on the night of·January 2, 1921, said Bank of Commerce, with the approval and under the direction and authority of the State Bank Commissioner, took over the assets of the Guaranty State Bank, and assumed its liabilities, and that said Bank of Commerce has been insolvent, making loans and carrying loans, far in excess of the amount permitted under the law, from January 3, 1921, until it was closed on November 2, 1921. All of this was done with the knowledge and consent of the Bank Commissioner. That the Legislature of the state of Oklahoma was in session from January 4, 1921, to April 4, 1921, and later, and a committee was appointed at said session of the Legislature to investigate and make a report of the State Banking Department of the state of Oklahoma, including the office of the Bank Commissioner. This committee reported that it appeared from the evidence adduced before it that, during the year 1920, the Bank Commissioner deposited about $700,000 in his personal account. For the year 1919, his account amounted to about $39,000. The Bank Commissioner testified that in the years of 1919 and 1920 he was buying commercial paper and selling it to the banks. The report then states:

"In the matter of the Guaranty State Bank of Okmulgee, it appears that Fred G. Dennis, Bank Commissioner, personally examined this bank on September 27, 1920, making a report on its condition as of September 25, 1920. The report is a very comprehensive report, and shows on sheets 'E' and 'E-2' a list of large loans, however, under the heading 'Excess Loans' nothing is shown, although at the date of the report, J. H. Rebold is shown to ·have been indebted to the bank in the sum of $462,000. The capital stock of the bank was $300,000 and surplus $100,000, so that the loan to Rebold was $62,000 in excess of the combined capital and surplus.

"There are several other parties who had loans in excess of 20 per cent. of the capital and surplus. The report does not contain any criticism as to any excess loans.

"It further appears from the testimony that on the same day Mr. Dennis examined this bank, he received from J. H. Rebold a check for $25,000. which Mr. Dennis testified was in payment for an oil lease of 130 acres located in sections 9, 10, and 15, township 2 south, range 23 west, Jackson

county, Okla. It further appears from the evidence that there was a dry hole on an adjoining section at the time .this sale is alleged to have been made, and that there was no producton of oil within 40 miles of this lease.

"It further appears from the evidence that this $25,000, which was in the form of a cashier's check, was cashed at the Wilkin-Hale State Bank, Oklahoma City, Okla., and was divided into three equal parts, in _he form of three cashier's checks. One of these checks was delivered by Mr. Dennis to Governor Robertson, and was deposited by the Governor in the First State Bank of Vinita, Okla., and part of it used to pay off a note of the Governor's in that bank, and the balance was later forwarded to the Governor and deposited to his account in the American National Bank of Oklahoma City.

"At this time Rebold was vice president and director in the bank, and was owner of 470 shares, as shown by the report of the Bank Commissioner.

"Mr. Rebold testified that he bought the lease from Mr. Dennis to sell to a man by the name of Clark, alleged to be from New York, who was negotiating for the purchase of the Harris oil property, southwest of Morris, and wanted this Jackson county lease in the deal. However, the deal was not made with Clark by Rebold, and the Harris property finally went to the Prairie Oil & Gas Company, and Rebold still holds the Jackson county lease.

"We think it fair to conclude that the Jackson county lease, which Mr. Rebold says was 120 acres instead of .130 acres, was not worth more than $1 per acre, if it had any cash value at all. The sale by the Bank Commissioner of an oil lease not worth more than $120 for $25,000 to an officer and director in a bank under examination, and whose individual indebtedness to the bank exceeded its capital and surplus, seems to us a questionable transaction, and one which has not been satisfactorily explained by either the Bank Commissioner or Rebold, and they are the parties who apparently are the only ones able to give the facts.

"In view of the unsatisfactory explanation, the committee is at liberty to reject such explanation and draw its own conclusion as to the reasons for the sale, and these conclusions are that the transaction was purely colorable as far as being a bona fide sale of an oil and gas lease, and that the real consideration for the $25,000 was the permitting of the bank to run on without requiring Rebold to reduce his line of credit to the limit fixed by law."

The cross-petitioners aver that the facts stated in said report and the conclusions and deductions contained therein are true, and make all of said report a part of their cross-petition.

This cross-petition further states that a grand jury, before the superior court of Okmulgee county, is now in session (the cross-petition was filed January 27, 1922), and on January 24, 1922, said grand jury, having made an investigation of the acts and conduct of the State Bank Commissioner and those acting for and with him in handling the assets and affairs of the Bank of Commerce, filed its written report to the superior court of Okmulgee county setting forth its findings upon the acts and conduct of the State Bank Commissioner in the management of the affairs of said bank, which report is now a part of the court records of Okmulgee county, and is as follows, to wit:

"In the matter of the investigation of the affairs of the Bank of Commerce of Okmulgee, Okla., from evidence submitted before the grand jury, the grand jury begs leave to submit the following preliminary report:

"On Friday, January 20, 1922, a number of diamonds held by the said Bank of Commerce as security, were sold by C. T. Huddleston, attorney at law, as attorney for said bank, and the grand jury finds that although the legal notices as provided by law were given, we find that no advertising or any notice was given of said sale so as to protect the depositors and other creditors of the Bank of Commerce, with the following results:

"First: Two pieces of jewelry (diamonds), which the grand jury believes from evidence introduced before it, were reasonably worth the sum of $5,000, were sold for $1,650, a part of this lot having been bought by the attorney for the bank, who was conducting the sale.

"Second: A diamond ring, which the grand jury believes from evidence introduced before it was reasonably worth the sum of $3,000, and which a citizen of Okmulgee county would have purchased for that price at the sale, had he been permitted to examine the same, was sold for the sum of $400.

"Third: Another lot of diamonds, which the grand jury believes was reasonably worth the sum of $4,000, was sold for $1,987.50. Part of this lot was also purchased by the attorney for the bank, who was conducting the sale.

"The grand jury reports that parties desiring to purchase and bid on these diamonds were denied by the deputy Bank Examiner having them in charge, to wit, Charles G. Seaton, the privilege of exam-

ining said diamonds in advance of the sale, and that this fact alone, in the opinion of the grand jury, had much to do with the inadequate price at which these jewels were sold at said sale.

"In the opinion of the grand jury, if it is possible to do so, all of said sales should be set aside in the interest of the depositors, stockholders and creditors of the Bank of Commerce and the makers of the notes for which said diamonds were being held as security.

"The grand jury further reports that since the Bank of Commerce has been in the hands of the Bank Commissioner and within the past few days, the exact date of which is unknown to the grand jury, the parties in charge of the bank, representing the Banking Board, turned over to the Guaranty State Bank, or its agents, notes amounting to the total sum of $395,000. It is the opinion of the grand jury, from evidence before it, that these notes should have been held by the parties in charge of the assets of said Bank of Commerce, and not turned over to the Guaranty State Bank until an order was made by some court authorizing such delivery.

"The grand jury respectfully recommends, if it is possible to be done, that an order issue out of this court, to the Banking Board and all persons having charge of any of the assets of the Bank of Commerce of Okmulgee and the Guaranty State Bank of Okmulgee, which bank is still in existence, directing that no property belonging to either the Bank of Commerce or the Guaranty State Bank be sold or in any manner disposed of, or removed from Okmulgee county, without an order from this court and subject to the approval of this court.

"All of which is respectfully submitted by the grand jury this 24th day of January, 1922."

The cross-petitioners then aver that the facts stated in said report and the conclusions and deductions contained therein are true, and make all of said report a part of their cross-petition, and further allege that said diamonds were sold without first obtaining an order of the court as provided by law.

That on November 2, 1921, the Bank of Commerce procured a loan of $50,000 from the Park National Bank of New York City, and placed with said bank, as collateral security, good solvent notes aggregating approximately the sum of $97,000. That while the State Bank Commissioner has had charge of the assets of said Bank of Commerce one of the directors of said bank paid off said $50,000 loan to the Park National Bank and procured an assignment to

himself of said collaterals amounting to $97,000, and is now claiming to be the owner of all of said collaterals and is proceeding to collect the same, which entails a loss of $47,000 to the creditors of said Bank of Commerce.

That at the time the Bank Commissioner took charge of said Bank of Commerce it had good notes of the value of about $50,000 which had been delivered to the Liberty Central Trust Company of St. Louis as collateral to secure the payment of a much smaller sum owing from said Bank of Commerce to said Liberty Central Trust Company. That the Bank Commissioner has failed and neglected to protect these collaterals, which will cause the stockholders, including these cross-petitioners and creditors of the Bank of Commerce, to sustain a loss of thousands of dollars.

The cross-petition of interveners sets forth many other allegations of fraud and misconduct on the part of the Bank Commissioner as the grounds upon which the cross-petitioners pray for the district court to appoint a receiver. This petition is duly verified by two of the interveners. The plaintiff, State of Oklahoma ex rel. S. P. Freeling, Attorney General, filed a motion to strike the cross-petition from the files, which motion the court overruled. Thereupon a demurrer was filed by the Attorney General in behalf of the state of Oklahoma. One of the grounds of said demurrer was that the cross-petition or petition of intervention does not state facts sufficient to constitute a cause of action, or entitle the said defendant and cross-petitioners to the relief prayed for or the appointment of a receiver. On the 4th day of February, 1922, the district court passed on the demurrer, as shown by the journal entry of said date, which reads in part as follows:

"Thereupon plaintiff filed its demurrer to said petition for receivers, which demurrer was duly heard and considered by the court, and said demurrer was also overruled and denied, to which holding and judgment of the court plaintiff excepts and refuses to plead further, said motion to strike said petition and said demurrer being treated and ordered filed as of this date."

By this demurrer the plaintiff in this action admits that all of the allegations contained in the petition are true. By refusing to plead further and standing upon its demurrer, the plaintiff still admits the allegations in the petition are true, and in passing on plaintiff's right to a writ of prohibition in this action this court must consider these allegations as true.

The court then proceeded to hear the petition for the appointment of a receiver, at the conclusion of which the court made an order appointing two receivers. We quote from paragraph five of the journal entry as follows:

"5. Thereupon counsel for the respective parties agreed upon and recommended to the court, the appointment of D. M. Smith and M. F. Graham, citizens of the city of Okmulgee, as receivers of said bank."

This is followed by an order appointing said D. M. Smith and M. F. Graham as receivers for said bank. The plaintiff excepted to the order of the court appointing the receiver, and gave notice of its intention to appeal to the Supreme Court of the state of Oklahoma. It thereafter made this application for a writ of prohibition.

It is clear that cross-petitioners were invoking the equitable jurisdiction of the district court and asking that a receiver be appointed because the assets of the bank were being depleted and their property rights jeopardized to their detriment and loss in thousands of dollars by reason of the. fraud, corruption in office, and maladministration on the part of the Bank Commissioner. There are no other grounds stated in the petition upon which they rely for the appointment of a receiver. The only purpose stated in the cross-petition for the appointment of a receiver is that the assets of this bank shall be protected from wanton, ruthless, and fraudulent dissipation and depletion by the Bank Commissioner. The Attorney General, by his demurrer, admits the truthfulness of each and all of the charges of fraud contained in the cross-petition, and the district court found they were true, yet the majority opinion, in one sentence, disposes of these charges of fraud contained in the petition by assuming they are not seriously relied on. It says:

"In justice to counsel, we may say that while their application for the appointment of a receiver and their return to the alternative writ are replete with serious charges of maladministration, dishonesty, and corruption in office, in their brief, which was prepared more soberly after mature reflection, they do not seriously rely on these charges."

To say they do not seriously rely on these charges of fraud or that they have abandoned them is to say they have abandoned the only right to relief the cross-petitioners have. In other words, they have abandoned the facts constituting their clients' cause of action when the statement of facts has been sworn to by their clients

and are not only admitted to be true by the demurrer of the Attorney General, but also found to be true by the solemn decree and judgment of the district court of Okmulgee county. Instead of this being in justice to counsel, as stated in the sentence quoted from the majority opinion, I consider it an injustice to counsel to assume they have abandoned these charges of fraud. This court has no right to disregard the admitted facts in the record, or assume any part of the answer to the alternative writ has been abandoned, and upon that assumption say that the district court of Okmulgee county is without jurisdiction to appoint a receiver.

The respondent, in passing upon the application for the appointment of a receiver, was performing his duty under his oath of office as district judge. As such district judge he could not disregard the allegations of fraud and maladministration set forth in the cross-petition and presented to him as the grounds upon which the cross-petitioners were asking that they be granted relief by a court of equity for the protection of their property rights. The respondent in answering the application for the writ of prohibition is still discharging his duty under his oath of office as district judge. In doing this he cannot waive, abandon, or disregard the charges of fraud set forth in the petition, upon which he acted in the appointment of a receiver, and which charges of fraud he found were true. They can only be waived or abandoned by the parties seeking the relief from the fraudulent practices alleged in their cross-petition. A district judge or judicial officer, against whom a writ of prohibition is asked for, does not stand before this court in the same position as parties litigant on appeal, who may waive or abandon certain grounds of error they may have theretofore alleged or relied upon. The question presented to this court in this application for a writ of prohibition is, Did the court have jurisdiction to make and enter the order complained of? If, under the facts presented to it, it did have jurisdiction to make and enter the order, the writ of prohibition should be withheld. However, I do not understand these charges of fraud have been abandoned by the respondent. In his printed brief, at pages 25 and 26, he states:

"Thus, in Lovett v. Lankford, 47 Okla. 12, 145 Pac. 767, the court, in holding that the Bank Commissioner and the Banking Board constitute a part of the executive branch of the state government, and the

duties devolving upon said officials require the exercise of judgment and discretion,' expressly said in this same connection that 'in the absence of allegation and proof of fraud, or arbitrary action, their decision in a matter within their jurisdiction will not be reviewed or controlled by a writ of mandamus.' This court, in that opinion, clearly recognizes the fundamental proposition that fraud cuts down every act, whether judicial or executive. Fraud cuts away the solemn judgment of courts of record, as they may be nullified by proof of fraud.

"We are not going to set out at large the allegations in the petition in the district court for the appointment of receivers, but suffice it to say that the petition charges, and the court found, that the Bank Commissioner was proceeding in positive violation of section 304, Rev. Laws 1910, in disposing of assets of the bank without an order of the court, and that various assets of the bank were being dissipated, etc. The cross-petition upon which the district court appointed the receivers alleges that the grand jury investigating the Bank of Commerce affairs made a report to the district court 'that since the Bank of Commerce has been in the hands of the Banking Commissioner, and within the last few days, the exact date of which is unknown to the grand jury, the parties in charge of the bank, representing the Banking Board, turned over to the Guaranty State Bank or its agents, notes amounting to the total sum of $395,000' and that 'it is the opinion of the grand jury, from evidence before it, that these notes should have been held by the parties in charge of the assets of said Bank of Commerce, and not turned over to the Guaranty State Bank until an order was made by some court authorizing such delivery.' The cross-petitioners aver 'that the facts stated in said report' are true. Now that allegation is not denied. That is a clear dissipation of the assets of the bank and in absolute violation of section 304, Rev. Laws 1910. Yet there is no remedy, as we cannot sue the Banking Board or the state. Thus the only thing to do was to appoint a receiver and stop this spoliation."

The above quotation from respondent's brief clearly indicates the charges of fraud have neither been abandoned nor waived. The record shows the fraud did exist. The facts constituting the fraud are set forth in the petition, which is duly verified by two of the cross-petitioners. The facts are admitted to be true by the demurrer of the Attorney General, and by the solemn decree and judgment of the district court · they were found to be true; then why should counsel elaborate upon or extensively argue in their brief that the fraud existed; when all the parties to the action admitted it existed and nobody denies it. Under the record in this case the fact of the fraud is not only established, but admitted; therefore, in the further consideration of this case, I will treat the question of fraud as an established fact.

The majority opinion says:

"Fraud cuts down everything, even judgments of courts and renders them void."

I agree with that statement; therefore, under the allegations of this petition, everything done by the Bank Commissioner in connection with the Bank of Commerce is void. Its insolvency was conceived by the fraudulent act of the Bank Commissioner in permitting it to assume the liabilities of the insolvent Guaranty State Bank and make loans to its stockholders and others in violation of law. The petition contains a recital of numerous acts and things done by the State Bank Commissioner, everyone of which reeks in fraud. Under the charges contained in the petition the depositors and stockholders of this bank have already suffered a loss of more than a half million of dollars if the acts of the Bank Commissioner are upheld. Surely if the state of facts disclosed by this record does not authorize a court of equity to appoint a receiver to take charge of these assets and to vacate the fraudulent acts of the Bank Commissioner and protect the property of the depositors and stockholders, then fails that ancient adage, "There is no wrong without a remedy."

Under this state of facts the district court would have jurisdiction to appoint a receiver, unless positively prohibited by the Constitution or statute, and I am unable to find any such inhibition.

We must not lose sight of the fact that the foundation principle upon which our government is based, is, "There shall be three co-ordinate branches. viz., executive, legislative, and judicial. The judicial is that branch which safeguards and protects the life. liberty. and property of the people. The district courts of this state are courts of general jurisdiction. and as such have power and authority under section 4979. Revised Laws 1910, to appoint receivers. Said section reads as follows:

"A receiver may be appointed by the Supreme Court, the district or superior court, or any judge of either, or, in the absence of said judges from the county, by the county judge:

"First. In an action by a vendor to vacate a fraudulent purchase of property, or

by a creditor to subject any property or fund to his claim, or between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose rights to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured. * * *

"Fifth. In the cases provided in this Code, and by special statutes, when a corporation has been dissolved, or is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights."

The court has jurisdiction of the parties, and, unless its jurisdiction is prohibited either by the Constitution or statutes, this court is not authorized to issue the writ of prohibition. The Constitution does not prohibit the court from exercising this jurisdiction, for sections 6 and 7 of the Bill of Rights reads as follows:

"Sec. 6. The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice.

"Sec. 7. No person shall be deprived of life, liberty, or property, without due process of law."

It is clear these sections of the Bill of Rights recognize in and intend to confer upon the judicial branch of the government that power and authority it was intended to perform, namely, to safeguard and protect life, liberty, and property. This safeguard and protection cannot be frittered away without weakening and eventually destroying the government. Neither can it be delegated to or conferred upon any legislative, administrative, or quasi judicial body, board, or commission to the exclusion of the judicial branch of the government. It has been well said that a government is no stronger than its courts.

The only authority the Bank Commissioner derives from the Constitution is found in section 1 of article 14, which reads:

"General laws shall be enacted by the Legislature providing for the creation of a Banking Department, to be under the control of a Bank Commissioner, who shall be appointed by the Governor for a term of four years, by and with the consent of the Senate, with sufficient power and authority to regulate and control all state banks, loan, trust and guaranty companies, under laws which shall provide for the protection of depositors and individual stockholders."

The majority opinion refers to the Bank Commissioner as a constitutional and statutory officer and says that certain acts on his part would not warrant the district court in discharging him and replacing him with a receiver appointed by the court. The section of the Constitution above quoted provides for a Banking Department to be under the control of a Bank Commissioner with sufficient power and authority to regulate and control state banks, loan, trust and guaranty companies under laws which shall provide for the protection of depositors and individual stockholders. By this section of the Constitution, the Bank Commissioner is not a constitutional receiver for insolvent banks. The Constitution only provides for the appointment of a Bank Commissioner to regulate and control state banks, etc., not insolvent institutions. The Legislature may define his duties, and limit the scope of his authority. As a receiver he is not a constitutional officer, for the Legislature could take away from him the right to act as a receiver; therefore his power and duties as a receiver for an insolvent bank are statutory, and in acting as such he would be a statutory receiver.

In removing the Bank Commissioner as the statutory receiver for the insolvent Bank of Commerce, the district court of Okmulgee county was not discharging a constitutional or statutory officer. It was merely exercising its equitable jurisdiction by removing a receiver for good and sufficient cause, taking the assets of this insolvent bank under its control and appointing a receiver as an arm of the court, to protect the property of these cross-petitioners under sections 6 and 7 of the Bill of Rights, supra. In other words, by the fraudulent acts of the Bank Commissioner these cross-petitioners were being fraudulently deprived of their property without due process of law, and said section of the Bill of Rights guarantees that the courts of justice of the state shall be open to every person to afford a remedy for every wrong or every injury to their property.

The fact that a receiver was appointed by the district court of Okmulgee county to take charge of the assets of the insolvent Bank of Commerce does not prevent the Bank Commissioner from exercising his authority to regulate and control state banks that are not insolvent, neither does it prevent him from acting as a statutory receiver for other banks that may now be or may hereafter become insolvent. But whenever the Bank Commissioner, as a statutory receiver, is fraudulently dispos-

ing of and dissipating the assets of any state bank, on a sufficient showing thereof made to the district court of the county in which such bank is situated, it becomes the duty of such court to remove such receiver and take such further proceedings as will protect the property rights of the depositors and individual stockholders as are guaranteed to them under said sections 6 and 7 of the Bill of Rights and said section 1 of article 14 of the Constitution.

Said section 1 of article 14, supra, does not purport to vest any exclusive authority in the Banking Department to wind up the affairs of an insolvent bank, neither does it purport to authorize the Legislature to enact a law that would vest exclusive control in the Banking Department to wind up the affairs of an insolvent bank and thus invade the judicial branch of the government by depriving the courts of jurisdiction to protect individuals in their property as guaranteed to them under the Bill of Rights.

The only exclusive control of insolvent state banks ever attempted to be vested in the Bank Commissioner was provided for in section 5, chapter 58, Session Laws of 1915, and this is only intended to be binding upon surety companies and prevent such surety companies from going into a court of equity and having a receiver appointed to wind up the affairs of the bank. This section reads as follows:

"Section 5. On and after the passage and approval of this act, in all cases where a surety company is compelled to pay, or voluntarily pays, a deposit of any state, county, municipal, or other public funds for which it is liable in a failed bank, operating under the banking laws of this state, such surety company shall be entitled to participate in a pro rata division of the proceeds of the assets of any such bank with the depositors' guaranty fund; and the Bank Commissioner shall have exclusive control of the administration and collection of the assets of failed banks, in which any part of the depositors' guaranty fund has been used for payment of depositors, until the depositors' guaranty fund is fully reimbursed and the Banking Board shall pay to such surety company its pro rata share of the proceeds of such assets from time to time as collections from such assets are made; and such surety company in writing a depository bond for any such bank specifically agrees to such administration and that the Bank Commissioner's jurisdiction shall be exclusive. All public deposits secured by surety company bonds or by the assets of any bank shall be included in the computations of average daily deposits as a

basis for assessments for the depositors' guaranty fund."

It is also noticeable that the exclusive jurisdiction thereby sought to be conferred upon the Bank Commissioner does not apply except in cases where any part of the depositors' guaranty fund has been used for the payment of depositors, and then only continues until the depositors' guaranty fund is fully reimbursed. It cannot be said that the Bank Commissioner has any exclusive control over the assets of the Bank of Commerce of Okmulgee, because no part of the depositors' guaranty fund has been used for payment of depositors.

Notwithstanding the Legislature of 1915 passed the act above referred to, being chapter 58, and that it was approved March 3, 1915, the same Legislature thereafter passed chapter 102, Session Laws of 1915, which was approved March 10, 1915. Section 5 of said chapter 102 reads as follows:

"Section 5. Wherever state banks are placed in the hands of a receiver, it shall be the duty of the court making the order appointing a receiver, to also make an order appointing the Attorney General as attorney for said receiver, and to allow a reasonable fee for such services; and such fee shall be paid over to the Bank Commissioner, and by him at the end of the month converted into the state treasury as a part of the general revenue fund."

This act clearly contemplated that courts of equity are not deprived of their power to appoint receivers for insolvent state banks. While chapter 102, Session Laws of 1915, was repealed by House Bill No. 334, chapter 215, Session Laws of 1919, section 3 provided that the Attorney General should assign one or more of his Assistants Attorney General to service in the Banking Department on request of the Banking Board or the Governor. The act in no way attempted to vest exclusive control in the Bank Commissioner to take charge of insolvent state banks or deprive a court of equity of its inherent power to appoint receivers for an insolvent bank. As no part of the depositors' guaranty fund has been used to pay depositors of the Bank of Commerce of Okmulgee, the Bank Commissioner cannot have exclusive jurisdiction to wind up the affairs of this bank. Neither has the Bank Commissioner or the Banking Board any lien upon the assets of the bank, because no part of the depositors' guaranty fund has been invested or used in connection with this bank that would create any lien. As the Bank Com-

missioner has not complied with either section 303, Revised Laws of 1910, or section 6 of chapter 22, Session Laws of 1913, supra, the only authority he has to act is conferred by section 302, Revised Laws of 1910. Under this section he is a statutory receiver, being appointed by statute; it being contemplated that he will immediately proceed under the succeeding section 303, Revised Laws of 1910, and pay the depositors. This gives him the right to have exclusive control of the administration and collection of the assets of the failed bank as provided for in section 5, chapter 58, Session Laws of 1915, supra. However, the above section could not be construed as depriving a court of equity of the right to appoint a receiver in place of the Bank Commissioner, if the Bank Commissioner was dissipating the funds or fraudulently disposing of the assets, such as is established in this case.

The case relied upon by the Attorney General and cited in the majority opinion are all cases in which neither fraud, incompetency, mismanagement, nor other dereliction of duty on the part of the Bank Commissioner is alleged or relied upon as grounds for a court of equity to exercise its equitable powers and appoint a receiver for the protection of the creditors of the insolvent bank. On the other hand, these very decisions clearly indicate, and most of them state, that a court of equity would not hesitate to appoint a receiver if applied for upon any of these grounds.

In Re Murray Hill Bank (N. Y.) 47 N. E. 298, cited in the majority opinion, the only question presented was whether or not the Superintendent of Banks had the right to continue as receiver in an action brought by the Attorney General under the statute, or whether the directors of the insolvent bank had the right to make application for the appointment of a different person to act as receiver. In this opinion it clearly recognizes that the Superintendent of Banks is merely a statutory receiver. We quote from the opinion at page 301 of the Northeastern Reporter as follows:

"By the banking law it confided summary power to the Superintendent of Banks to temporarily sequester the property of the bank and take it into his possession for the protection of the public, in anticipation of action by the Attorney General through the courts for its sale and distribution. The command was that when a bank, upon due examination, should be found in an unsound or unsafe condition to do banking business, the superintendent might not only take possession of its property, but he could also retain such possession during the continuance of the action commenced by the Attorney General. The object of this unusual power is to preserve the property for the purpose of administration under the banking law and the provisions of the Code. The superintendent is made the statutory custodian until either the capital is restored by the voluntary action of the directors and stockholders, or proceedings in invitum are taken by the Attorney General. * * *"

In McDavid v. Bank of Bay Minette (Ala.) 69 South. 453, the court quotes from the case of Anderson v. Seymour, 70 Minn. 358, 73 N. W. 171 (both of these cases are cited in the majority opinion), and says:

"The Supreme Court of Minnesota had under consideration in the case of Anderson v. Seymour, supra, an act somewhat similar to the one here under review, and in which case a number of objections were presented to the act upon constitutional grounds. The law was held to be free from constitutional objection. It was also held that the receiver appointed pursuant to the banking act had the prior right to enforce the stockholders' liability—a right theretofore held by creditors only—and that the receiver had, so to speak, the right of way, and the creditor was not permitted to supersede it or to commence proceedings himself **without good cause shown, as for example, that the receiver is incompetent or disqualified or has willfully neglected his duty.**"

In Cartmell v. Commercial Bank & Trust Co. (Ky.) 156 S. W. 1048, cited in the majority opinion, the Court of Appeals of Kentucky clearly recognizes the right of creditors to seek relief in a court of equity if the Bank Commissioner was not discharging his duty. We quote from page 1052 of the Southwestern Reporter as follows:

"Indeed, there is no necessity for a receiver, when the Banking Commissioner proceeds as directed by the provisions of this act, for, when he takes charge of a bank, all of his acts are such as might properly be discharged by a trustee or other person or officer occupying a fiduciary position. The object and aim of the law, in the appointment of a receiver, is to see that the assets of the institution, in charge of which he is placed, are properly, honestly, and economically administered. The ends of the law are satisfied, if the estate is administered in this way, whether the person charged with its administration be termed a Banking Commissioner, a trustee, or an assignee. The duties are the same. * * *

"Of course, if the commissioner does not act and directors refuse to take the initiative, a court of chancery would undoubtedly have the right to appoint a receiver for the preservation of the assets of the bank and

the protection of the interests of the creditors, upon a proper showing and request on the part of creditors. But the basis for the action, in a case of this character, would be the failure and refusal of the commissioner to discharge a duty which the act under consideration plainly imposes upon him. The act, when properly and fairly construed and administered, affords ample, full, and complete protection to all depositors and creditors of a bank when found to be in an unsafe or insolvent condition; and, as stated, in all cases where the Banking Commissioner should refuse to discharge the duties imposed upon him by the act, creditors would have the undoubted right to seek relief in a court of equity. No such condition existed in the case at bar. The commissioner and a majority of the board of directors, when the bank was found to be insolvent, at once placed its assets in the hands of the commissioner as provided by the act; and at the time of the institution of this suit, the assets were being preserved and collected for the benefit of appellants and all other creditors of the bank. The interests of appellants were as fully, amply, and completely safeguarded and protected as they would have been were a receiver of court, instead of the Banking Commissioner, discharging these duties. The Banking Commissioner and directors have proceeded in strict conformity with the requirements of the act. It being conceded that the bank was, at that time, insolvent, their act and proceedings were fully justified."

In Ex rel. Lofthus, State Bank Examiner, v. Langer, Attorney General (N. Dak.) 177 N. W. 408 (cited in the majority opinion), Robinson, J., in a special concurring opinion, used this language:

"But it is insisted that this court has not jurisdiction and that it should not follow the example of him who took water and washed his hands, saying: 'I am innocent of the blood of this just man; see ye to it.'

"When in the language of the Scripture, it might be well said: 'Therefore is judgment far from us, neither doth justice overtake us; we wait for light, but behold obscurity; for brightness, but we walk in darkness. We grope for the walls like the blind, and we grope as if we had no eyes; we stumble at noonday as in the night. And judgment is turned away and equity cannot enter.'

"But such is not the condition. The Supreme Court is supreme. It has justice (jurisdiction) over all other courts, state banking boards, and all other such administrative boards, and it may say to each of them: 'Thus far shalt thou go and no farther.' Manifestly, it is within the power and duty of the Supreme Court to use and adopt such measures as may be necessary to enforce and protect all the constitutional guaranties of life, liberty, and property. It is not competent for the lawmakers to give arbitrary power to any board or body of men. Every power is given on condition that it must be used justly, fairly, honestly, and not in an arbitrary manner."

The respondent in his brief cites and relies upon some decisions in which the facts are similar to the facts in the instant case wherein the various courts have announced the doctrine that a court of equity has power to appoint a receiver where the assets of an insolvent bank are being wasted or its affairs mismanaged.

In State v. Farmers' State Bank of Decatur (Neb.) 170 N. W. 901, the Supreme Court of Nebraska said:

"This is in direct contravention of the statute. Where the direct provisions of the statute with reference to the disposition of a trust fund are ignored to the injury of a contributor to the fund, it occupies a like position to that of a stockholder in a corporation whose directors are diverting the property of the corporation to its damage. In such case he has a property right which a court of equity will protect if the proper officers of the corporation refuse or neglect to protect his interest. An analogous situation is presented here if the proof bears out the charges made, and the contributors to the fund are entitled to apply to a court of equity to protect their interests, if they are not taken care of by the officers of the state."

In Jeffries v. Bacastow, Receiver (G. Luther Brown et al., Appellants), 90 Kan. 495, 135 Pac. 582, the court said:

"The fact of insolvency having been discovered, the statute directs the Bank Commissioner's course, and the designation by him of a person to wind up the affairs of the bank is no more a judicial act than his order to the board of directors to remove a dishonest cashier. His powers are purely administrative, and in no way infringe upon the ancient authority of courts to determine rights of person and property in specific controversies pending before them."

The majority opinion does not refer to section 303, Revised Laws of Oklahoma, 1910. This section reads as follows:

"In the event that the Bank Commissioner shall take possession of any bank or trust company which is subject to the provisions of this chapter, the depositors of said bank or trust company shall be paid in full, and when the cash available or that can be made immediately available of said bank or trust company is not sufficient to discharge its obligations to depositors, the

said Banking Board shall draw from the depositors' guaranty fund and from additional assessments, if required, as provided in section 300, the amount necessary to make up the deficiency; and the state shall have, for the benefit of the depositors' guaranty fund, a first lien upon the assets of said bank or trust company, and all liabilities against the stockholders, officers and directors of said bank or trust company and against all other persons, corporations, or firms. Such liabilities may be enforced by the state for the benefit of the depositors' guaranty fund."

It is clear from the reading of this section that neither the Banking Board, the Bank Commissioner, nor the state of Oklahoma has any lien upon the assets of an insolvent bank until the depositors have first been paid in full. The petition states and the demurrer admits that not any one of the depositors of this bank has been paid either in full or in part out of the guaranty fund. Neither have they been paid any part of their deposits out of the cash available or that can be made immediately available of said bank. How can there be a lien created on the assets of the bank in favor of the Banking Board or the bank guaranty fund when it has not paid out any money or thing of value that it is entitled to recover back out of such assets?

The majority opinion relies in part on section 300, Revised Laws of Oklahoma, 1910, and quotes extensively from said section. This section of the statute has been repealed. Section 2, article 2, House Bill No. 615, Session Laws of 1908, provides for creating and maintaining a depositors' guaranty fund. This law did not provide for issuing certificates of indebtedness to depositors in lieu of cash. Section 3, article 2, chapter 5, act of March 11, 1909, amended section 2, of article 2, Laws of 1908, supra, and provided that the Banking Board shall issue and deliver certificates of indebtedness to depositors of failed banks when such depositors could not be paid in full out of the depositors' guaranty fund. The latter part of said section 3 is embodied in section 300, Revised Laws of 1910. Section 3, chapter 31, Session Laws of 1911, amended section 3, article 2, chapter 5, Session Laws of 1909, and, as thus amended, it was the law at the time of the adoption of the Harris-Day Code, otherwise known as Revised Laws of 1910. Chapter 39, Session Laws of 1911, pages 70 and 71, is the act adopting the Harris-Day Code. The last portion of section 2 of said chapter 39 reads:

"Provided. Further. that this act shall not be construed to repeal any act of the Legislature enacted subsequent to the adjournment of the extraordinary session of the Legislature which convened in January, 1910."

Therefore, said section 3, chapter 31, Session Laws of 1911, amending said section 3, article 2, chapter 5, Session Laws of 1909, became the law and section 300, Revised Laws of 1910, was thereby repealed. Chapter 22, Senate Bill No. 231, Session Laws of 1913, page 23, is an act amending sections 1, 2, and 3, of chapter 31, Session Laws of 1911, and section 3, article 2, Session Laws of 1908. Section 6 of said chapter 22, Session Laws of 1913 specifically amended section 3 of the act of the Legislature of 1911. We quote a part from page 29, Session Laws of 1913, as follows:

"If at any time the depositors' guaranty fund on hand shall be insufficient to pay the depositors of failed banks, or other indebtedness properly chargeable against the same, the Banking Board shall have authority to issue certificates of indebtedness to be known as 'depositors' guaranty fund warrants of the state of Oklahoma,' in order to liquidate the deposits of failed banks, or any other indebtedness properly chargeable against said depositors' guaranty fund.

"Depositors' guaranty fund warrants of the state of Oklahoma shall bear six per cent. interest from date of issue, payable annually, and shall be issued in such form as may be prescribed by the Banking Board, and shall constitute a charge and first lien upon the depositors' guaranty fund when collected, as well as a first lien against the capital stock, surplus, and undivided profits of each and every bank operating under the banking laws of the state of Oklahoma to the extent of liability of any such bank to the depositors' guaranty fund under the provisions of this act, and said Banking Board shall have authority to negotiate or otherwise dispose of such depositors' guaranty fund warrants, at not less than par value, in such manner as it may see fit to facilitate the liquidation of failed banks."

From and after the passage of said act of 1913, the Banking Board has had neither power nor authority to issue to any depositor of a failed bank certificates of indebtedness. The only provision under the law, as it has existed since 1913, is for the Banking Board to issue and sell warrants at not less than par and bearing six per cent.

The majority opinion states that there are two ways for the State Banking

Board to function, and relies on section 300, Revised Laws of 1910, as providing one of the ways. As already pointed out, this section has been repealed, and section 6, chapter 22, Session Laws of 1913, is now the law governing the Banking Board in taking over insolvent state banks and it provides the only way. It is not even contended the Banking Board has followed this statute. .

The object of the framers of the Constitution was to so safeguard the banking institutions of this state that those who deposited their money in such banks would be protected from loss: First, by creating a Banking Department with authority to regulate and control such banks, and thus reduce the number of bank failures to the minimum; second, by providing a guaranty fund to immediately pay depositors the amount of their deposits in any such bank that may become insolvent. In every act of the Legislature pertaining to the banking system they have sought to attain this object of protection to depositors and individual stockholders. The Legislature of 1913. realizing that issuing certificates of indebtedness in lieu of cash to depositors of insolvent banks was not the best way to protect such depositors. enacted section 6, chapter 22, Session Laws of 1913, supra. which provides that guaranty fund warrants shall he negotiated and the proceeds thereof used to pay such depositors. Just as there is a scarlet thread running through the entire length of every rope used upon any man-of-war, or other vessel belonging to the British Navy. so in every act of the Legislature pertaining to the banking laws of Oklahoma do we find a thread running through such acts and laws designated for the protection of depositors and individual stockholders. In construing these laws this court should follow the thread which emanates from the Constitution and is clearly discernible in every act of the Legislature and is designed to protect the depositors of insolvent state banks' and guarantee them from loss by reason of the failure of such banks. To prohibit a district court from appointing a receiver to protect the assets of such insolvent bank from being fraudulently dissipated is to place such depositors in a worse position than if the framers of the Constitution had not even attempted to protect such depositors.

It is admitted that the warrants issued by the State Banking Board cannot be negotiated nor any payment made to the depositors of this insolvent bank, therefore these depositors can only be protected by receiving their pro rata share derived from the assets of the failed bank. The Attorney General, in his brief, recognizes the hopeless insolvent condition of the bank guaranty fund, for he says:

"The guaranty fund at present is financially embarrassed because of the fact that the demands made upon it for the last two years have greatly exceeded the amounts collected from the assessments on state banks. At present depositors cannot be paid in full in cash from this fund, and the Bank Commissioner cannot raise cash by the issuance of warrants, because he cannot sell guaranty fund warrants at par as required by the law. However, we do not know how soon the fund will be restored. We do not know but what even the next session of the Legislature will provide some means of repairing this fund."

The Bank Commissioner took charge of the assets of this bank on November 2, 1921, yet on February 6, 1922, more than three months after the bank was closed by the Bank Commissioner, not one cent had been paid to the depositors. Surely there was a sufficient amount of assets of said bank that could have been immediately available to pay depositors so that the depositors could have received some part of their deposits.

Briefly summarized, the record and admitted facts show the unsecured depositors had on deposit in said bank at the time it was taken over by the State Bank Commissioner the sum of $1,459,000. The assets amounted to approximately $1,460,000. The Bank Commissioner by his fraudulent acts and failure to conserve the assets of said bank has depleted said assets to the extent and amount of $500,000. This amounts to a loss of more than one-third of its available assets, yet the majority opinion affords no relief for these unfortunate depositors. If the Bank Commissioner may squander, embezzle, or otherwise dispose of one-third of the bank's assets in less than three months, before one cent has been paid to depositors, and the courts can afford no relief, then what is to prevent him from dissipating the remainder of its assets before its affairs are wound up? If he can dissipate one-third and the depositors and stockholders have no relief, then if he dissipated another third or two other thirds, they would still have no relief. Then, I ask, what has become of the protection to life, liberty, and property. to be

afforded by the courts as guaranteed under the Bill of Rights?

In the depleted condition of the assets of this bank, caused by the arbitrary actions, mismanagement, and fraud of the Bank Commissioner, the unsecured depositors will eventually receive at least 40 per cent. less than they would have received by a careful and judicious management of its affairs.

As stated in the majority opinion, "Fraud cuts down everything, even judgments of courts and renders them void." The fraud disclosed by this record would vitiate the Bank Commissioner's fraudulent transactions, and by action timely taken these assets which have been fraudulently disposed of could be returned into the channel from which they had been diverted. In this way these depositors could be protected by a court of equity. The district court of Okmulgee county was affording the only relief available to these depositors. By appointing the receivers, proper actions could have been instituted by them and court orders legally made by which these receivers would have been possessed of practically all of the assets that had been fraudulently dissipated.

I conclude that under the facts presented by this record and under the Constitution and laws of this state, the district court of Okmulgee county had jurisdiction to appoint a receiver for the insolvent Bank of Commerce and to make the order it did make. Therefore, the writ of prohibition should not issue.

I am authorized to say that ELTING and KENNAMER, JJ., concur in this dissenting opinion.