**MOTHERSEAD, State Bank Com'r of Oklahoma, v. UNITED STATES FIDELITY & GUARANTY CO.**

Circuit Court of Appeals, Eighth Circuit.
October 28, 1927.

No. 7400.

1. **Banks and banking** ⟺80(4)—Where guaranty fund is not involved, state is not preferred creditor of insolvent bank, but all creditors participate ratably (Comp. St. Okl. 1921, §§ 4165–4167, 4175).

Under Comp. St. Okl. 1921, §§ 4165–4167, 4175, providing for winding up insolvent banks by state bank commissioner and for a lien on bank's assets for benefit of bank depositors' guaranty fund for payments therefrom, where guaranty fund is depleted and no payments have been made, or will be made, therefrom to pay unsecured depositors, state has no lien for benefit of such fund against the assets of bank involved and is not a preferred creditor, but all creditors are entitled to participate ratably in the distribution of the bank's assets.

2. **Courts** ⟺367(1)—Decision of highest state court after rights and liabilities have accrued is not binding on federal courts as rule of decision.

Decision rendered by the highest state court after rights and liabilities of parties under con-

tracts involved in federal court suit have fully accrued is not binding on federal courts as a rule of decision.

**3. Banks and banking ⊕⟹80(4)—Surety on depository bonds is entitled to participate ratably with unsecured depositors on claims to which it became subrogated, where guaranty fund not involved (Comp. St. Okl. 1921, §§ 4165–4167, 4175).**

A surety on bonds securing deposits in an insolvent bank which has paid secured deposits, is entitled under Comp. St. Okl. 1921, §§ 4165–4167, 4175, to participate ratably with unsecured depositors on the claims of the state, county, and cities to which it became subrogated, where state depositors' guaranty fund was not involved.

**4. Banks and banking ⊕⟹80(4)—Insolvent banks, surrendering assets to bank commissioner, made assignment and committed bankruptcy, within statute giving priority to claims of United States (Comp. St. Okl. 1921, §§ 4128, 4133; 31 USCA §§ 191, 193; Bankr. Act, § 3a [4], as amended Feb. 5, 1903, § 2 [11 USCA § 21]).**

Banks which were insolvent, in that their assets were less than their liabilities, and which voluntarily at informal directors' meeting surrendered their assets to state bank commissioner for liquidation, under Comp. St. Okl. 1921, §§ 4128, 4133, thereby made a voluntary assignment of their property within Rev. St. U. S. § 3466 (31 USCA § 191), and committed an act of bankruptcy, within Bankruptcy Act, § 3a (4), as amended by Act Feb. 5, 1903, § 2 (11 USCA § 21), and claims of United States on its deposits had priority under Rev. St. §§ 3466, 3468 (31 USCA §§ 191, 193), to which surety on depository bonds was subrogated on payment of claims.

**5. Banks and banking ⊕⟹86—Bank organized under Oklahoma laws has all powers of ordinary corporation, except as expressly limited (Comp. St. Okl. 1921, § 4114).**

Under Comp. St. Okl. 1921, § 4114, a bank organized under the laws of Oklahoma has all of the powers of an ordinary corporation, except in so far as its powers are expressly limited by other sections of the state banking laws.

**6. Banks and banking ⊕⟹86—Bank commissioner held not entitled to avoid as ultra vires insolvent banks' pledge of securities to indemnify surety on depository bonds under fully executed contracts (Comp. St. Okl. 1921, §§ 4114, 5161, 5727, 8606).**

Where insolvent banks received benefit of depository bonds of surety company, with which they had pledged securities to indemnify it against loss on such bonds, *held* that, under Comp. St. Okl. 1921, §§ 4114, 5161, 5727, 8606, state bank commissioner in charge of liquidation could not avoid contracts of pledge on ground they were ultra vires, since securities pledged were held by surety in trust for obligees, and in view of fact that securities could have been pledged directly to the state or municipality for public deposit, and that surety in such case would have been subrogated thereto.

**7. Banks and banking ⊕⟹80(3)—Surety on depository bonds held entitled to 6 per cent. interest on deferred payments on claims respecting which it was entitled to ratable participation with unsecured creditors.**

In suit by surety on bonds given to secure deposits in insolvent banks against state bank commissioner for ratable distribution of secured deposits with unsecured deposits, decree for surety, on claims which it was adjudged to be entitled to participate in ratably with unsecured creditors, properly allowed 6 per cent. interest on deferred dividend payments from dates like dividends were paid to unsecured depositors.

**8. Banks and banking ⊕⟹80(3)—Surety on bonds securing United States deposits in insolvent banks held entitled to interest at rate banks contracted to pay United States (31 USCA §§ 191, 193).**

Surety on bonds securing deposits in insolvent banks adjudged to be entitled to priority under Rev. St. §§ 3466, 3468 (31 USCA §§ 191, 193), by subrogation to claims of United States on its deposits, *held* properly allowed interest at rate which banks contracted to pay United States.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit by the United States Fidelity & Guaranty Company against O. B. Mothersead, Bank Commissioner of the State of Oklahoma. Decree for plaintiff, and defendant appeals. Affirmed.

M. W. McKenzie and Gentry Lee, both of Oklahoma City, Okl., for appellant.

C. B. Ames, of Oklahoma City, Okl. (Joseph A. McCullough, of Baltimore, Md., J. C. Monnet, Jr., of Oklahoma City, Okl., and Ames, Lowe & Cochran, of Oklahoma City, Okl., on the brief), for appellee.

Before BOOTH, Circuit Judge, and TRIEBER [1] and PHILLIPS, District Judges.

PHILLIPS, District Judge. This is an appeal from a decree in favor of the United States Fidelity & Guaranty Company (hereinafter called the surety company) in a suit brought by it against O. B. Mothersead, bank commissioner of the state of Oklahoma (hereinafter called the bank commissioner). The suit involves the liquidation of a large number of insolvent banks in the state of Oklahoma. The material facts are not in dispute and are as follows:

The surety company had executed and delivered depository bonds as surety for such banks to secure deposits made therein by the

---

[1] The late Judge Trieber concurred in this opinion during his lifetime.

United States, the state of Oklahoma, and certain counties and cities of the state of Oklahoma. When the banks failed, the surety company paid to the respective obligees in the bonds the amounts of their deposits.

In the agreed statement of facts, it was stipulated "that each one of the banks involved in this cause was at the time of its failure insolvent, in that it did not have sufficient property to pay all of its debts, in that the actual cash market value of its assets was insufficient to pay its debts, and in that the aggregate of its property was not at a fair valuation sufficient in amount to pay its debts."

For the purpose of convenience, the banks were classified as classes 1, 2, 3, and 4. Class 1 included banks in which there were deposits of state, county, or city funds secured by the bonds of the surety company. Class 2 included banks in which there were deposits of state, county, or city funds secured in part by the bonds of the surety company and in part by the pledge of securities. Class 3 included banks which the bank commissioner upon examination found to be insolvent, and upon his own initiative took charge of for the purpose of liquidating and winding up their affairs, and in which there were deposits belonging to the United States secured by the bonds of the surety company. Class 4 included banks which voluntarily placed themselves in the hands of the bank commissioner for liquidation, and in which there were deposits belonging to the United States secured by the bonds of the surety company.

The banks falling in class 4 may be divided further into subclasses A and B. The board of directors of each bank, in subclass A, held an informal meeting and, recognizing its insolvency, decided to request, and did request, the bank commissioner to take charge, and thereupon the bank commissioner took charge of each of such banks for the purpose of liquidating its assets and winding up its affairs. The board of directors of each bank, in subclass B, held an informal meeting, and, recognizing its insolvency, decided to place it in the hands of the bank commissioner.

Section 4133, Comp. Okl. St. 1921, in part, provides: "Any bank doing business under this chapter may place its affairs and assets under the control of the bank commissioner by posting a notice on its front door as follows: 'This bank is in the hands of the state bank commissioner.'"

Pursuant to such decision of its board of directors and in compliance with the above statute, each of the banks in subclass B closed its doors and caused a notice signed by one of its officers to be posted thereon, which read as follows: "This bank is in the hands of the state bank commissioner." The bank commissioner was then notified of the action taken, and he thereupon took charge of each of such banks for the purpose of liquidating its assets and winding up its affairs.

Upon taking charge of each of the banks falling in classes 3 and 4, the bank commissioner entered an order, which, except as to date, name of assistant bank commissioner and name and location of bank, was substantially as follows:

"Order.

"In the Office of the State Bank Commissioner in and for the State of Oklahoma:

"In re Stuart State Bank of Stuart, Oklahoma.

"Now, on this 31st day of October, 1923, the attention of the bank commissioner of the state of Oklahoma is called to the condition of the Stuart Bank, of Stuart, Oklahoma.

"And thereupon, after considering the recommendations of E. E. Wilson, a duly appointed assistant bank commissioner, who has examined the affairs of said bank, and being familiar with the condition of said bank, I am satisfied that said Stuart State Bank is insolvent for the following reasons, to wit:

"First. That the actual cash market value of its assets is insufficient to pay its liabilities.

"Second. That said bank is unable to meet the demands of its creditors in the usual and customary manner.

"Third. That said bank has failed to make good its reserve as required by law.

"And I am of the opinion that said bank should be closed and its books, records and assets taken charge of by me as bank commissioner of the state of Oklahoma, as provided by law.

"It is therefore considered, ordered, and adjudged by me, as bank commissioner of the state of Oklahoma, that the Stuart State Bank, of Stuart, Oklahoma, be and the same is hereby adjudged to be an insolvent institution, and it is further ordered that the said bank be closed forthwith; and I hereby take charge of all the books, records, and assets of every kind and character belonging to said bank; and I further direct and order that E. E. Wilson, a duly appointed and acting assistant bank commissioner, shall immediately take charge of said bank; that he shall forthwith post a notice on the front door of said bank, which notice shall be as follows:

" 'October 21, 1923 (Date).

" 'This bank is in the hands of the state bank commissioner.

" 'O. B. Mothersead,

"Bank Commissioner.' "

The decree of the trial court directed the bank commissioner to allow the claims of the surety company, based upon its right of subrogation to the claims of the state and various counties and cities of the state whose deposits were secured by the bonds of the surety company and which were paid by the surety company, and to pay dividends thereon ratably with unsecured depositors.

Counsel for the bank commissioner contend that, under the laws of Oklahoma, the assets of an insolvent bank must be converted into cash and distributed as follows: First, in the payment of the claims of unsecured depositors; and, second, pro rata to the secured depositors and other general creditors, after unsecured depositors are paid in full.

The provisions of the Oklahoma statutes upon which counsel rely are:

"*Commissioner to Wind up Affairs of Banks, When.* Whenever any bank or trust company organized or existing under the laws of this state shall voluntarily place itself in the hands of the bank commissioner, or whenever any judgment shall be rendered by a court of competent jurisdiction, adjudging and decreeing that such bank or trust company is insolvent, or whenever its rights or franchises to conduct a banking business under the laws of this state shall have been adjudged to be forfeited, or whenever the bank commissioner shall become satisfied of the insolvency of any bank or trust company, he may, after due examination of its affairs, take possession of said bank or trust company and its assets, and proceed to wind up its affairs and enforce the personal liability of the stockholders, officers and directors." Section 4165, Comp. Okl. St. 1921; section 302, R. L. Okl. 1910.

"*Same—Depositors to be Paid, How.* In the event that the bank commissioner shall take possession of any bank or trust company which is subject to the provisions of this chapter, the depositors of said bank or trust company shall be paid in full, and when the cash available or that can be made immediately available of said bank or trust company is not sufficient to discharge its obligations to depositors, the said banking board shall draw from the depositors' guaranty fund and from additional assessments, if required, as provided in Section 300, the amount necessary to make up the deficiency; and the State shall have, for the benefit of the depositors' guaranty fund, a first lien upon the assets of said bank or trust company, and all liabilities against the stockholders, officers and directors of said bank or trust company and against all other persons, corporations or firms. Such liabilities may be enforced by the State for the benefit of the depositors' guaranty fund." Section 4166, Comp. Okl. St. 1921; section 303 R. L. Okl. 1910.

"*Assets Collected, etc.* The bank commissioner shall take possession of the books, records and assets of every description of such bank or trust company, collect debts, dues and claims belonging to it, and upon order of the district court, or judge thereof, may sell or compound all bad or doubtful debts, and on like order may sell all the real or personal property of such bank or trust company upon such terms as the court or judge thereof may direct, and may, if necessary, pay the debts of such bank or trust company, and enforce the liabilities of the stockholders, officers and directors: Provided, however, that bad or doubtful debts as used in this section shall not include the liability of stockholders, officers or directors." Section 4167, Comp. Okl. St. 1921; section 304, R. L. Okl. 1910.

"*Deposits Not Protected by Guaranty Fund.* No deposit in a state bank, otherwise secured, shall be protected by, or paid out of, the depositors' guaranty fund created under the laws of the state of Oklahoma, nor included in the computation of average daily deposits as a basis for assessments. * * *" Section 4175, Comp. Okl. St. 1921; Sess. L. 1913, p. 31, § 9.

The guaranty fund is depleted. No payments have been or will be made from that fund to the unsecured depositors in the banks here involved. No certificates of indebtedness payable from such fund have been or will be issued to such depositors.

In support of their contention, counsel for the bank commissioner cite Columbia Bank & Trust Co. v. United States F. & G. Co., 33 Okl. 535, 126 P. 556; Lankford v. Okla. E. & P. Co., 35 Okl. 404, 130 P. 278; Lovett v. Lankford, 47 Okl. 12, 145 P. 767; Lankford v. Schroeder, 47 Okl. 279, 147 P. 1049, L. R. A. 1915F, 623; Capitol State Bank v. Western Casualty & Guaranty Ins. Co., 47 Okl. 549, 149 P. 149; United States F. & G. Co. v. State, 67 Okl. 14, 168 P. 234; State ex rel. Short v. Norman, 86 Okl. 36, 206 P. 522; White v. State, 94 Okl. 7, 220 P. 624.

These cases lay down the following propositions:

First, that public deposits secured by

surety bonds or by deposit of securities, in the event of the insolvency of the depository bank, are not protected by the guaranty fund, and the state, administrative board, or municipality making such deposit is not entitled to participate in payments from such guaranty fund. Columbia Bank & Trust Co. v. United States F. & G. Co., supra; Lovett v. Lankford, supra; United States F. & G. Co. v. State, supra; chapter 22, § 9, S. L. 1913; section 4175, Comp. Okl. St. 1921.

Second, that the state has a lien upon the assets of an insolvent bank for the amount of payments made from the guaranty fund, which is prior to the claims of general creditors and of the state and municipalities having public deposits in such bank. Columbia Bank & Trust Co. v. United States F. & G., supra; Lankford v. Okl. E. & P. Co., supra; Capitol State Bank of Oklahoma City v. Western Casualty & Guaranty Ins. Co., 47 Okl. 549, 149 P. 149.

In Lankford v. Oklahoma Co., supra, the court said:

"Section 323, Comp. Laws 1909, provides that the state shall have, for the benefit of the depositors' guaranty fund, a first lien upon the assets of any defunct bank or trust company, and all liabilities against the stockholders, officers, or directors thereof, and against all other persons, corporations, or firms; and that such liabilities may be enforced by the state for the benefit of the depositors' guaranty fund. The effect of this statute is to make the state a preferred creditor until any deficiency in the guaranty fund, created by the payment therefrom of the depositors of an insolvent bank, is made up."

Third, that when the lien of the guaranty fund has been satisfied, secured depositors have the right to participate pro rata with general creditors in the distribution of the assets of the bank. Lankford v. Okl. E. & P. Co., supra; Lankford v. Schroeder, 47 Okl. 279, 147 P. 1049, L. R. A. 1915F, 623; Capitol State Bank of Oklahoma City v. Western Casualty Co., supra.

Fourth, that the rights of a surety company which has executed a bond to secure a public deposit, has paid such deposit and has become subrogated to the rights of the state or municipality owning such deposit, except in so far as they are made subject to the prior lien of the state for the benefit of the guaranty fund, are the same as they would be if the bond had been executed to secure such a deposit made in a bank or trust company within the state not governed by the guaranty law. Columbia Bank & Trust Co. v. United States F. & G. Co., supra; Lank-

ford v. Oklahoma E. & P. Co., supra. In the latter case the court said:

"The question raised by counsel is somewhat similar to the one decided by this court in the case of Columbia Bank & Trust Co. v. United States Fidelity & Guaranty Co., 33 Okl. 535, 126 P. 556. In that case the surety company sought to compel the bank commissioner to discharge the liability of its principal, for which otherwise it would be bound, out of the depositors' guaranty fund. The court held that that could not be done, and in defining the status of a surety, under conditions created by the bank guaranty law, says: 'That, with the exception of the first lien of the state upon the assets, etc., of the insolvent state banks created by section 323, supra, for the benefit of the depositors' guaranty fund, the rights and liabilities of the surety company are the same as they would have been if the bond was executed to secure the deposit of a part of the permanent school fund in any bank or trust company within or without the state, not governed by the bank guaranty law.' "

Fifth, that when the guaranty fund has failed to function because of depletion, so that no preferred claim against the assets of the bank has accrued to the state, through payments from the guaranty fund, the affairs of such insolvent bank are to be administered by the bank commissioner pursuant to the provisions of sections 4165 and 4167, supra, rather than under the provisions of section 4166, supra. State v. Norman, 86 Okl. 36, 206 P. 522. In that case the court, in speaking of a situation where the guaranty fund was depleted and no payments were made therefrom, said:

"It is reasonably clear that it was the intention of the Legislature that the bank guaranty law shall function in two ways, to wit: First, by immediately paying the depositors of the insolvent bank in full where the cash available or which can be made immediately available from the assets of the bank, together with the money on hand in the guaranty fund, is sufficient for that purpose; and, second, where such funds are not sufficient for that purpose, by issuing certificates of indebtedness payable from year to year as money comes into the guaranty fund from the assessments and emergency assessments against solvent banks as provided for by law. * * *

"The bank guaranty law, as we have seen, was enacted pursuant to the express mandate of the Constitution primarily for the protection of depositors in failed banks, and it must be liberally construed so as to carry

out this purpose. Obviously it was not intended to take from this class of creditors any of the rights to which they were formerly entitled as such depositors, but to add to and increase such rights. * * *

"In the case at bar, the affairs of the failed bank are being wound up under the second plan, and the question arises:

"What shall be done with the proceeds derived from the assets of failed banks under these circumstances? The general answer to this question may be found in sections 302 and 304 [Rev. Laws 1910] in substance as follows: The bank commissioner shall take possession of the books, records, and assets of such bank, collect debts, dues, and claims belonging to it, and proceed to wind up its affairs and enforce the personal liability of the stockholders, officers, and directors. These are very broad and comprehensive directions, and, unless they are limited by some other provisions of the banking law, they empower the bank commissioner to do everything necessary to wind up the affairs of an insolvent bank, including the sale of the assets and the distribution of the proceeds among the creditors. The term 'wind up,' when construed in connection with the context of the section in which it is found and in connection with the broad terms of section 304, supra, undoubtedly embraces the entire process of settling the accounts and liquidating the assets of failed banks for the purpose of making distribution and dissolving the corporation. Counsel for defendant claim that language is found in part of section 300, supra, which requires the bank commissioner to turn the proceeds from the sale of the assets in to the guaranty fund generally instead of paying it to the creditors. * * *

"If no money has been paid out of the fund to the depositors of such bank, then the assets of the failed bank cannot be used to repay the depositors' guaranty fund, for the simple reason that the bank owes it nothing.

"The guaranty fund is created by assessments and replenished by emergency assessments levied against solvent banks, and, speaking of it as a legal entity, it becomes a preferred creditor of an insolvent bank by paying the depositors of such bank, and in that event it stands just like any other creditor, except the state has a first lien upon the assets of the bank to insure repayment to the guaranty fund of the sum of money it has paid out to depositors. If the guaranty fund does not become a creditor of the failed bank—that is, if there are no moneys paid out of the said fund to depositors of such

failed bank—obviously the proceeds of the assets are distributed among the other creditors in the process of winding up the affairs of such bank pursuant to the general directions to the bank commissioner contained in the general statutes hereinbefore referred to."

[1] Thus it will be seen that it is the provision for the guaranty fund, for the payment of unsecured creditors therefrom, and for the lien of the state upon the assets of the insolvent bank for the amount of such payments which postpone the rights of creditors, other than unsecured depositors, to participate in the distribution of the assets of the insolvent bank, and that except for such provisions there is nothing in the statutes of Oklahoma which creates any priority in favor of unsecured depositors in the distribution of the assets of an insolvent bank. It is the provision for a prior lien in favor of the state to the extent of payments made from the guaranty fund which creates a priority in favor of the state, makes the state a preferred creditor and indirectly making the unsecured depositors preferred creditors in the distribution of the assets of the insolvent bank. The state is the only creditor preferred by the statute. When no payments are made from the guaranty fund, no lien arises in favor of the state, it does not become a preferred creditor, and all creditors are entitled to participate ratably in the assets of the insolvent bank which are to be collected, administered and distributed pursuant to the provisions of sections 4165 and 4167, supra.

Since the guaranty fund is depleted, and no moneys have been or ever will be taken from such fund to pay unsecured depositors, it follows that the state has no lien for the benefit of the guaranty fund against the assets of the banks here involved, the state is not a preferred creditor, and all creditors are entitled to participate ratably in the distribution of the assets of such banks under sections 4165 and 4167, supra.

This was the holding of this court in the case of Strain v. United States F. & G. Co. (C. C. A.) 292 F. 694, and 264 U. S. 570, 44 S. Ct. 334, 68 L. Ed. 854.

Counsel for appellant also cite and strongly rely upon the recent decision of the Supreme Court of Oklahoma in State ex rel. v. Zoll, 113 Okl. 208, 240 P. 1035, decided May 12, 1925. In this case, the bank commissioner in charge of the Bartlesville State Bank, an insolvent banking institution, brought an action against Zoll as a stockholder of the bank to recover a stockholder's liability. Zoll filed an answer and cross-peti-

tion, alleging that the stock sold to him was void, and sought to recover the amount paid by him to the bank for such stock. The trial court awarded him a judgment for $4,375, the amount which he paid for the stock, and decreed the same to be a claim against the bank on a parity with the depositors and other creditors of the bank. The Supreme Court of Oklahoma, on appeal, held that Zoll was not entitled to participate in the distribution of the assets of the bank until the unsecured depositors had been paid in full. The question of whether unsecured depositors would have a prior right to secured depositors in the distribution of the assets of the bank was not involved and was not expressly decided.

[2] The Supreme Court of Oklahoma in the opinion in the Zoll Case does not expressly overrule its former decisions, and we are not called upon to decide whether it overruled them by implication. Even if that be the fact, yet, since in the instant case the contracts of suretyship were entered into, the deposits secured thereby were paid by the surety company and the rights and liabilities of the parties thereto were fully accrued and fixed prior to the decision in the Zoll Case, we are not bound to follow that decision. Folsom v. Township 96, 159 U. S. 611, 16 S. Ct. 174, 40 L. Ed. 278; Carroll County v. Smith, 111 U. S. 556, 4 S. Ct. 539, 28 L. Ed. 517; Burgess v. Seligman, 107 U. S. 20, 33, 2 S. Ct. 10, 27 L. Ed. 359; Thompson v. Perrine, 103 U. S. 806, 26 L. Ed. 612; Pine Grove Township v. Talcott, 19 Wall. (86 U. S.) 666, 22 L. Ed. 227.

In Carroll County v. Smith, supra, the court said:

"The decision in Hawkins v. Carroll County [50 Miss. 735], above referred to, is not a judgment of the Supreme Court of Mississippi, construing the Constitution and laws of the state, which, without regard to our own opinion upon the question involved, we feel bound to adopt and apply in the present case. It is a decision upon the very bonds here in suit, pronounced after the controversy arose, and between other parties. It was not a rule previously established, so as to have become recognized as settled law, and which, of course, all parties to transactions afterwards entered into would be presumed to know and to conform to. When, therefore, it is presented for application by the courts of the United States, in a litigation growing out of the same facts, of which they have jurisdiction by reason of the citizenship of the parties, the plaintiff has a right, under the Constitution of the United States, to the

independent judgment of those courts, to determine for themselves what is the law of the state, by which his rights are fixed and governed. It was to that very end that the Constitution granted to citizens of one state, suing in another, the choice of resorting to a federal tribunal. Burgess v. Seligman, 107 U. S. 20, 33, 2 S. Ct. 10, 27 L. Ed. 359."

In Burgess v. Seligman, supra, the court said:

"So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued."

[3] After a painstaking examination of the statutes involved and the decisions bearing thereon, we find ourselves in accord with the opinion expressed in the decisions of the Oklahoma Supreme Court which preceded the Zoll Case—that the statutes of Oklahoma create no priority in favor of any creditor in the distribution of assets of insolvent banks except to the state in cases where it makes payments to unsecured depositors out of the guaranty fund.

We therefore conclude that the surety company was entitled to participate ratably with the unsecured depositors, upon the claims of the state, county, and cities to which it became subrogated.

[4] The decree of the trial court directed the bank commissioner to allow the surety company preferred claims for the deposits of the United States secured by the bonds of the surety company and paid by it.

Such preferred claims of the surety company are predicated on the provisions of sections 3466 and 3468 of the Revised Statutes, which read as follows:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed." U. S. Comp. St. § 6372, 1 Stat. 676 (31 USCA § 191).

"Whenever the principal in any bond given to the United States is insolvent, or whenever, such principal being deceased, his estate and effects which come to the hands of his executor, administrator, or assignee, are insufficient for the payment of his debts, and, in either of such cases, any surety on the bond, or the executor, administrator, or assignee of such surety pays to the United States the money due upon such bond, such surety, his executor, administrator, or assignee, shall have the like priority for the recovery and receipt of the moneys out of the estate and effects of such insolvent or deceased principal as is secured to the United States; and may bring and maintain a suit upon the bond, in law or equity, in his own name, for the recovery of all moneys paid thereon." U. S. Comp. St. § 6374, 1 Stat. 676 (31 USCA § 193).

Counsel for the bank commissioner place much reliance upon the decision of the Supreme Court in United States v. Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. Ed. 638. That case was disposed of upon bill and motion to dismiss. The bill did not allege either that the bank was insolvent or that it had committed an act of bankruptcy in the sense those terms are used in the federal statutes.

Here the stipulation of facts shows that at the time the bank commissioner took charge thereof, each bank was insolvent in "that it did not have sufficient property to pay all of its debts, in that the actual cash market value of its assets was insufficient to pay its debts, and in that the aggregate of its property was not at a fair valuation sufficient in amount to pay its debts."

In Bramwell v. United States F. & G. Co., 269 U. S. 483, 46 S. Ct. 176, 70 L. Ed. 368, the Savings Bank of Klamath Falls, Or., on January 28, 1922, had on deposit certain funds belonging to the United States. This deposit was secured by the bond of the surety company. The bank was insolvent and on that day suspended payment. Because of its condition, the board of directors passed a resolution giving full control of its affairs to Bramwell, superintendent of banks for the state of Oregon. Pursuant to the laws of the state, he took possession and control of the bank's property and business for the purpose of liquidation. The surety company paid the United States the amount of the deposit and took an assignment of its claim against the bank. The surety company then asserted the claim that it should be paid in full out of the bank's assets prior to any payment on account of unsecured or unpreferred claims. The bank superintendent denied priority, but allowed the claim as one not preferred. The surety company then brought suit to enforce its alleged right of priority. From a decree in favor of the surety company (295 F. 331), affirmed by the Circuit Court of Appeals (299 F. 705), the bank superintendent perfected an appeal to the Supreme Court. The provisions of the Oregon statutes, providing when and how the bank superintendent may take charge of a bank for liquidation and prescribing his powers and duties in the liquidation of an insolvent bank, are substantially the same as the Oklahoma statutes. In passing on the alleged claim of priority asserted by the surety company in the Bramwell Case, the Supreme Court said:

"It was admitted that the total value of the bank's assets was less than its debts, and that it was insolvent. * * *

"Appellee [the surety company] is entitled to priority if, within the meaning of section 3466, the bank made a voluntary assignment of its property or committed an act of bankruptcy.

"That section is to be liberally construed. In Beaston v. Farmers' Bank, 12 Pet. 102 [9 L. Ed. 1017], Mr. Justice McKinley, speaking for the court, said (page 134): 'All debtors to the United States, whatever their character, and by whatever mode bound, may be fairly included within the language used. * * * And it is manifest, that Congress intended to give priority of payment to the United States over all other creditors, in the cases stated therein. It, therefore, lies upon those, who claim exemption from the operation of the statute, to show that they are not within its provisions. * * * As this statute has reference to the public good it ought to be liberally construed. United States v. The State Bank of North Carolina, 6 Pet. 29 [8 L. Ed. 308]. * * *'

"Appellant, emphasizing the view that the priority act does not apply unless insolvency is manifested in one of the modes there indicated, contends that the resolution of the board of directors was not a voluntary assignment and did not divest the bank of the title; that, as the Bankruptcy Act does not apply to banks, there was no act of bankruptcy committed. * * *

"The specified ways in which insolvency may be manifested include all cases in which an insolvent debtor makes an assignment of his property; there is no exception, and no regard is had to the purpose or manner of the assignment; and they include all cases in which an act of bankruptcy is committed under the laws of a state or under a national

bankruptcy law. Conard v. Nicoll, 4 Pet. 291, 307, 308 [7 L. Ed. 862]; United States v. Oklahoma, supra, 262 [43 S. Ct. 295]. * * *

"Section 3a (4) of the Bankruptcy Act, as amended February 5, 1903, c. 487, 32 Stat. 797 [11 USCA § 21], provides: 'Acts of bankruptcy by a person shall consist of his having * * * (4) made a general assignment for the benefit of his creditors, or, being insolvent, applied for a receiver or trustee for his property or because of insolvency a receiver or trustee has been put in charge of his property under the laws of a state, of a territory, or of the United States.' The fact that banks are not subject to that act is of no moment. The reference to an act of bankruptcy in section 3466 is general, and is for the purpose of defining one of the ways in which the debtor's insolvency may be manifested. * * *

"The statutes of the state (sections 6220–6223) provide for the handing over of the property of insolvent banks to the state superintendent of banks to be by him administered and disposed of for the benefit of creditors. By the resolution of the directors in this case, the bank was wholly divested of the possession and control of its property and business; and the exclusive possession and control of them passed to appellant for the purpose of liquidating the debts of the bank. And, under the state law, when he took possession of its assets, liens thereon, amounting in all to more than the value of the property, attached in favor of the depositors. Section 6220 (h); Upham v. Bramwell, 105 Or. 597, 606–609, 613 [209 P. 100, 210 P. 706, 25 A. L. R. 919]. He was empowered, and it became his duty, to collect all debts and claims belonging to the bank, to sell its property under the direction of the court, and to execute and deliver to purchasers deeds and other instruments to evidence the passing of title to them; and, if necessary to pay the bank's debts, he was authorized to enforce the individual liability, if any, of the stockholders. And it was his duty, out of the estate, to pay expenses, and from time to time, as directed by the court, to apply the funds remaining in his hands to the payment of the bank's creditors according to their rights and priorities. United States F. & G. Co. v. Bramwell, supra, 288. After 60 days had elapsed the bank could not regain the property. Section 6223 (c). The state law excludes all other methods for the liquidation of the debts of insolvent banks. Appellant's duties were in substance the same as those of a trustee having the le-

gal title of property for the purpose of converting it into money to be paid over to specified persons. The state law required him to perform the functions of an assignee, receiver or trustee for the liquidation of the debts of an insolvent. See Sargent v. American Bank & Trust Co., 80 Or. 16, 26 [154 P. 759, 156 P. 431]. * * *

"The effect of the resolution of the bank directors is the same as if it expressly granted and imposed upon appellant all the powers and duties in respect of the bank's property and the liquidation of its debts that are specified in the state law. The resolution authorized and was followed by the handing over of the possession and control of all the bank's property to be converted into money to pay the bank's debts. The act of the directors made the bank's insolvency notorious. The established rule of liberal construction requires that the priority act be applied having regard to the public good it was intended to advance. Its application is not to be narrowly restricted to the cases within the literal and technical meaning of the words used. The things done in this case are not different in their substance from the things specified as the ways in which insolvency is required to be made manifest. It must be held that, within the meaning of the priority act, the bank made a voluntary assignment of its property; and that, because of the bank's insolvency, a trustee was put in charge of its property under a state law within the meaning of the Bankruptcy Act."

This case clearly rules the instant case in so far as it involves the surety company's claim of priority on account of deposits of the United States paid by it, in the banks falling in classes 3 and 4.

In U. S. v. Oklahoma, supra, the court said:

"The meaning of the word 'insolvent' used in the act and of the insolvency therein referred to is limited by the language to cases where 'a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment,' etc."

The banks in classes 3 and 4 were clearly insolvent in the sense that they did not have sufficient property to pay all their debts. The banks falling in class 4 made a voluntary assignment of their property within the meaning of section 3466. The banks falling in classes 3 and 4 committed an act of bankruptcy, in that, because of insolvency, a trustee was put in charge of their property under the state law within the meaning of the national Bankruptcy Act. The order of the bank commissioner clearly showed that

because of such insolvency he took charge of the banks and their property under the laws of the state of Oklahoma.

Counsel for the bank commissioner undertake to distinguish the instant case from the Bramwell Case, because in the Bramwell Case there was formal action by a written resolution of the board of directors of the insolvent bank, whereas, here the directors of the insolvent banks in class 4 acted informally. This contention is without merit. No action of the boards of directors was necessary. The banks were insolvent. Section 4128 of the Compiled Oklahoma Statutes 1921 provides that no bank shall accept or receive deposits when such bank is insolvent, and that any officer, director, cashier or manager of any bank who shall knowingly violate the provisions of such section shall be guilty of a felony and upon conviction shall be punished as therein provided. Section 4133 quoted above provides how an insolvent bank may place its affairs and assets under the control of the bank commissioner. These statutes conferred the necessary authority and clearly required the officers of such banks on the event of their insolvency to cease accepting deposits, to close their doors and to place their assets and affairs in the hands of the bank commissioner. The officers only followed the clear and positive mandate of the statute.

It follows that a priority accrued in favor of the United States on account of the deposits of the United States in such banks at the time they failed, to which the surety company, through payments of such deposits, became subrogated.

[5, 6] Certain of the banks pledged with the surety company securities to indemnify it against loss on account of its liability as surety on the depository bonds of such banks. The trial court decreed that the surety company was entitled to retain such securities. Counsel for the bank commissioner contend that such pledges were ultra vires, and that the surety company should have been required to surrender the securities pledged.

These securities consisted of liberty bonds, county warrants, and similar securities. The contracts have been fully executed and the banks have secured the benefit of the depository bonds executed by the surety company. Section 4114, Comp. St. Okl. 1921, provides, in part, as follows:

"The secretary of state shall issue a certificate in the form provided by law for other corporations, and the existence of such bank as a corporation shall date from the filing of its articles of incorporation and the issuance of certificate of the secretary of state, *from which time it shall have and may exercise the powers conferred by law upon corporations generally, except as limited or modified by this chapter.*" (Italics ours.)

A bank organized under the laws of Oklahoma, therefore, has all of the powers of an ordinary corporation, except in so far as its powers are expressly limited by other sections of the banking laws of Oklahoma. We find no statute expressly prohibiting such a pledge to the surety company. Furthermore, sections 5727 and 8606, Comp. St. Okl. 1921, provide that a bank may pledge United States bonds, state bonds, county bonds, and state, county, or city warrants in lieu of a surety bond to secure deposits. These securities therefore could have been pledged directly to the state or municipality for the public deposit. Here the pledge was to the surety company, which in turn secured the deposit by its surety bond. Under well settled principles of suretyship law, the securities pledged were held by the surety company in trust for the obligees in the bonds. Chamberlain v. St. Paul & S. C. R. Co., 92 U. S. 299, 23 L. Ed. 715; Tompkins Co. v. Catawba Mills (C. C.) 82 F. 780, 784; Eastman v. Foster, 8 Metc. (49 Mass.) 19; Chambers v. Prewitt, 172 Ill. 615, 50 N. E. 145; 21 R. C. L. p. 1094, § 132; Section 5161, Comp. St. Okl. 1921. On the other hand, if the pledges had been made directly by the banks to the state or municipality, the surety company would now be subrogated to such securities. Maryland Casualty Co. v. Repass (C. C. A. 4) 253 F. 328; Ricker v. Ricker, 248 Mass. 549, 143 N. E. 539; 25 R. C. L. pp. 1377, 1378, § 6061; Stearns on Suretyship (3d Ed.) § 247. It therefore follows, under the facts as they now exist, that the result is exactly the same as if the securities had been pledged directly by the banks to secure the deposits in strict accordance with the provisions of sections 5727 and 8606.

Since the contracts of pledge in question appear to be within the general powers given to the banks under the provisions of section 4114, and since the result is the same as if the banks had pledged the securities in accordance with sections 5727 and 8606, and since the banks have secured the benefit of the depository bonds executed by the surety company, we do not think the bank commissioner can now avoid the contracts of pledge on the ground that they were ultra vires.

[7, 8] The decree of the trial court directed the allowance of interest on the claims of the surety company held to be entitled to participate ratably with the unsecured creditors

at the rate of 6 per cent. per annum upon deferred dividend payments from the dates like dividends out of the several banks were paid to the unsecured depositors. This allowance was proper. Chemical National Bank v. Armstrong (C. C. A. 6) 59 F. 372, 28 L. R. A. 231; Merrill v. First National Bank of Jacksonville (C. C. A.) 75 F. 148; Id., 173 U. S. 131, 19 S. Ct. 360, 43 L. Ed. 640; Armstrong v. American Exchange National Bank, 133 U. S. 433, 10 S. Ct. 450, 33 L. Ed. 747. The decree also directed the allowance of interest upon the claims decreed to be entitled to priority under section 3466, supra, at the rate of 4½ per cent. per annum, the rate which the banks contracted to pay the United States. Since the surety company became subrogated to the rights of the United States, this allowance was also proper. American Surety Co. v. Carbon Timber Co. (C. C. A. 8) 263 F. 295; Spring Coal Co. v. Keech (C. C. A. 4) 239 F. 48, L. R. A. 1917D, 1152.

It follows that the decree of the District Court was right, and it is affirmed.